**Kenneth DONALDSON, Plaintiff-Appellee,**

v.

**J. B. O'CONNOR, M. D. and John Gumanis, M. D., Defendants-Appellants.**

**No. 73–1843.**

United States Court of Appeals,
Fifth Circuit.

April 26, 1974.

James G. Mahorner, Gen. Counsel, State of Fla., Dept. of Health & Rehabilitative Services, Tallahassee, Fla., for Gumanis.

Mary E. Clark, Robert L. Shevin, Atty. Gen., Daniel S. Dearing, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for O'Connor.

Morton Birnbaum, Brooklyn, N. Y., Bruce J. Ennis, New York City, George Dean, Jr., Destin, Fla., Eugene Z. DuBose, Jr., N. H. Legal Assist., New York City, for plaintiff-appellee.

Before RIVES, WISDOM and MORGAN, Circuit Judges.

WISDOM, Circuit Judge:

This case requires us to decide for the first time the far-reaching question whether the Fourteenth Amendment guarantees a right to treatment to persons involuntarily civilly committed to state mental hospitals. The plaintiff-appellee, Kenneth Donaldson, was civilly committed to the Florida State Hospital at Chattahootchee in January 1957, diagnosed as a "paranoid schizophrenic". He remained in that hospital for the next fourteen and a half years. During that time he received little or no psychiatric care or treatment.

Donaldson contends that he had a constitutional right to receive treatment or to be released from the state hospital.

In this action, filed February 24, 1971, he seeks damages under 42 U.S.C. § 1983[1] against five hospital and state mental health officials who allegedly deprived him of this constitutional right.[2] A jury returned a verdict of $28,500 in compensatory damages, and $10,000 in punitive damages against the two defendants-appellants, Dr. J. B. O'Connor and Dr. John Gumanis. Dr. O'Connor, as Acting Clinical Director of the hospital, was Donaldson's attending physician from the time of his admission until mid-1959. He was Clinical Director of the hospital from mid-1959 until late 1963, and Superintendent thereafter until his retirement February 1, 1971. Dr. John Gumanis was Donaldson's attending physician from the fall of 1959 until the spring of 1967. He was added as a defendant by an amended complaint filed April 20, 1972. The jury returned a verdict in favor of the other three defendants.

Gumanis and O'Connor bring separate appeals to this Court. They challenge the sufficiency of the evidence to support the jury verdict[3] and they contend that the Constitution does not guarantee a right to treatment to mental patients involuntarily civilly committed. Both argue, therefore, that the trial judge erred in denying a motion to dismiss for failure to state a claim and in instructing the jury that civilly committed mental patients have a constitutional right to treatment. In addition, Gumanis raises a number of lesser issues. We hold that the Fourteenth amendment guarantees involuntarily civilly committed mental patients a right to treatment, and that the evidence was sufficient to support the verdict. We also reject the numerous lesser contentions advanced by Gumanis. Accordingly, we affirm the judgment in Donaldson's favor.

### I.

To put the legal issues in proper context as well as to discuss the defendants' challenge to the sufficiency of the evidence, it is essential to review the facts in unusual detail.

Donaldson was committed January 3, 1957, on the petition of his father and after a brief hearing before a county judge of Pinellas County, Florida. He was admitted to the Florida State Hospital twelve days later, and soon thereafter was diagnosed as a "paranoid schizophrenic". The committing judge told Donaldson that he was being sent to the hospital for "a few weeks" to "take some of this new medication", after which the judge said that he was certain that Donaldson would be "all right" and would "come back here". Donaldson

---

1. 42 U.S.C. § 1983 provides:

   statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. Except when the text clearly indicates otherwise, we use the term "defendants" in this opinion to refer to Dr. Gumanis and Dr. O'Connor, against whom judgments were rendered. The other three who were sued were: Dr. Francis G. Walls, who became Acting Superintendent of the Hospital when O'Connor retired from that position in February 1971, and who held that position for about four months; Dr. Milton J. Hirschberg, who became permanent Superintendent,

succeeding O'Connor, in June 1971; and Emmett S. Roberts, Secretary of the Department of Health and Rehabilitative Services in Florida at the time Donaldson filed his First Amended Complaint August 30, 1971.

3. The defendants raised the question of the sufficiency of the evidence on a motion for directed verdict made at the close of the plaintiff's evidence, and renewed at the close of all evidence. The defendants apparently did not move for judgment notwithstanding the verdict after the verdict was returned, but they did move for a new trial. The first ground they asserted in their motion for new trial was that "[t]he verdict is contrary to the clear weight of the evidence, which evidence showed that Defendants reasonably believed in good faith that due to his mental illness and need of treatment Plaintiff was properly confined".

was not released until July 31, 1971, after he had instituted this suit.

There is little dispute about the general nature of the conditions under which Donaldson was confined for almost fifteen years. Donaldson received no commonly accepted psychiatric treatment. Shortly after his first mental examination, Donaldson, a Christian Scientist, refused to take any medication or to submit to electroshock treatments, and he consistently refused to submit to either of these forms of therapy. No other therapy was offered. At trial, Gumanis mentioned "recreational" and "religious" therapy as forms of therapy given Donaldson; but this amounted to allowing Donaldson to attend church and to engage in recreational activities, privileges he probably would have been allowed in a prison. In the oral argument on appeal the appellants' counsel made much of what they called "milieu therapy", which they said was given Donaldson. This was nothing more than keeping Donaldson in a sheltered hospital "milieu" with other mental patients; the defendants did not refer to anything specific about the "milieu" that was in any special way therapeutic.[4] Donaldson was usually confined in a locked room, where, according to his testimony, there were about sixty beds, with little more room between beds than was necessary for a chair; his possessions were kept under the bed. At night he was often awakened by some who had fits and by some "who would torment other patients, screaming and hollering". Then there was "the fear, always the fear you have in your heart, I suppose, when you go to sleep that maybe somebody would jump on you during the night".

A third of the patients in the ward were criminals. Indeed, Donaldson testified, "The entire operation of the ward was geared to criminal patients."[5]

4. "Milieu therapy" is a frequent response by doctors and hospitals to claims by patients that they are receiving inadequate treatment. See Halpern, A Practicing Lawyer Views the Right to Treatment, 1969, 57 Geo.L.J. 782, 786–87, n. 19. Halpern discusses "milieu therapy" in analyzing Rouse v. Cameron, 1966, 125 U.S.App.D.C. 366, 373 F.2d 451, a pioneer case in which the District of Columbia Court of Appeals (Bazelon, J.) held that there was a statutory right to treatment. Halpern notes that "milieu therapy" is an "amorphous and intangible" concept, "the easiest therapeutic claim for an institution to assert and the most difficult for a patient to refute", Halpern, *supra*, at 787 n. 19.

5. Some of Donaldson's testimony relating the conditions under which he lived is worth quoting:

"Q. Now, in the buildings you lived in Department A, were those buildings locked?
A. Yes, sir.
Q. Were the wards you lived on locked?
A. Yes.
Q. Were there metal enclosures on the windows?
A. Yes, padlocks on each window.
Q. Approximately how many beds were there in the rooms where you slept?
A. Sixty some beds.
Q. How close together were they?
A. Some of the beds were touching, the sides touched, and others there was room enough to put a straight chair if we had had a chair.
Q. Did you have chairs in the room you were in?
A. There wasn't a chair in the room I was in. . . .
Q. Now, Mr. Donaldson, you were civilly committed. You had not been charged with any crime, is that right?
A. That is right.
Q. Were there criminal patients on your ward?
A. There were criminal patients on the ward.
Q. Approximately what percent of the population on your ward were criminals?
A. Looking back, roughly, I would say a third. I do not know the figures for the whole department.
Q. Let's just talk about your ward.
A. Okay, I would say about a third in the wards I was in.
Q. Now, did you sleep in the same rooms as the criminal patients?
A. Yes.
Q. Did you get up at the same time?
A. Yes.
Q. Did you eat the same food?
A. Yes.
Q. In the same dining room?
A. Yes.
Q. Did you wear the same clothes?
A. Yes. The entire operation of the wards I was on was geared to the criminal patients.

During his first ten years at the hospital, progress reports on Donaldson's condition were irregularly entered at intervals averaging about one every two and a half months. During those first ten years, he requested grounds privileges and occupational therapy; his requests were denied. In short, he received only the kind of subsistence level custodial care he would have received in a prison, and perhaps less psychiatric treatment than a criminally committed inmate would have received.

At the time Donaldson was admitted to the hospital in 1957, O'Connor was Assistant Clinical Director of the hospital. As Assistant Clinical Director, he was in charge of the hospital's Department A, then the white male ward, where Donaldson was assigned upon his admission to the hospital. In that position, O'Connor was Donaldson's attending physician. At that time, Gumanis was a staff physician in Department A. On July 1, 1959, O'Connor became Clinical Director of the hospital, and in the fall of 1959, Gumanis was placed in charge of Department A, and became Donaldson's attending physician. O'Connor was promoted from the position of Clinical Director to the position of Superintendent July 30, 1963, and served as Superintendent until he retired February 1, 1971. Gumanis served as Donaldson's attending physician until

April 18, 1967, when Donaldson was transferred to Department C, until that time the Negro male ward. After the transfer, Donaldson's attending physician was Dr. Israel Hanenson, the head of Department C until Dr. Hanenson's death in the fall of 1970. After that, until his release, Donaldson's attending physician was Dr. Jesus Rodriguez.

Donaldson brought this suit while he was still a patient at the hospital. In his original complaint, Donaldson sought to bring this suit as a class action on behalf of all patients in the hospital's Department C. In addition to damages, to the plaintiff and to the class, the complaint sought habeas corpus relief directing the release of Donaldson and of the entire class, and sought broad declaratory and injunctive relief requiring the hospital to provide adequate psychiatric treatment.

After Donaldson's release, and after the district court dismissed the action as a class suit, Donaldson, on August 30, 1971, filed his First Amended Complaint. This complaint sought individual damages and renewed Donaldson's prayers for declaratory and injunctive relief to restrain the enforcement of Florida's civil commitment statutes unless Florida provided adequate treatment to its civilly committed mental patients. The complaint asked the district court to convene a three-judge district court to

Q. Let me ask you, were you treated any differently from the criminal patients?

A. I was treated worse than the criminal patients.

Q. In what sense were you treated worse?

A. The criminal patients got the attention of the doctors. Generally a doctor makes a report to the court every month.

Q. For the criminal?

A. On the criminal patients, and that would be a pretty heavy case load. It didn't give them time to see the ones who weren't criminal patients.

Q. Was there a place on the ward you had access to for keeping personal possessions?

A. No, not at that time.

Q. What did you do with your personal possessions?

A. I kept mine in a cedar box under the mattress of my bed.

Q. Was there a place in the wards where you could get some privacy?

A. No, not anytime in all of the years I was locked up.

Q. Were you able to get a good nights sleep?

A. No.

Q. Why not?

A. On all of the wards there was the same mixture of patients. There were some patients who had fits during the night. There were some patients who would torment other patients, screaming and hollering, and the fear, always the fear you have in your mind, I suppose, when you go to sleep that maybe somebody will jump on you during the night.

They never did, but you think about those things. It was a lunatic asylum."

consider the plaintiff's attack on the constitutionality of the civil commitment statutes as they then operated. On November 30, however, the plaintiff in a memorandum brief abandoned the prayer that a three-judge court be convened. The prayers for injunctive and declaratory relief therefore were effectively eliminated from the case.

The key allegation in the amended complaint charged that the defendants O'Connor and Walls had "acted in bad faith toward plaintiff and with intentional, malicious, and reckless disregard of his constitutional rights". The complaint alleged examples of such actions, including the denial to Donaldson of grounds privileges; the refusal of the psychiatrists to speak with him, even at his own request; refusal or obstruction of his opportunities for out-of-state discharge, despite a recommendation by a staff conference that he be given such a discharge, and despite the presentation of a signed parental consent to such a discharge. The core of the charge, however, was that Walls and O'Connor acted intentionally and maliciously in "confining Donaldson against his will, knowing that [he] was not physically dangerous to himself or others"; in confining him "knowing that [he] was not receiving adequate treatment, and knowing that absent such treatment the period of his hospitalization would be prolonged"; and that they "intentionally limit[ed] [his] 'treatment' program to 'custodial care' for the greater part of his hospitalization". Corresponding to these allegations, the complaint sought $100,000 damages against Walls and O'Connor.

The trial began November 21, 1972, and continued for four days. The jury returned a verdict awarding Donaldson $17,000 in compensatory damages and $5,000 in punitive damages against O'Connor, and $11,500 in compensatory damages and $5,000 in punitive damages against Gumanis. The jury returned verdicts in favor of the other three defendants. From the judgment entered on this verdict, Gumanis and O'Connor appeal.

The trial centered, of course, upon the conditions of Donaldson's confinement and upon the defendants' behavior toward Donaldson. On the record as a whole, there was ample evidence to support the jury's reaching any or all of the conclusions set forth in the following subsections in Part I of this opinion.

A. *The defendants unjustifiably withheld from Donaldson specific forms of treatment.*

The evidence establishes that there were at least three forms of treatment the defendants withheld from Donaldson.

First, he was denied grounds privileges. Since the purpose of hospitalization is to restore the capacity for independent community living, one of the most basic modes of treatment is giving a patient an increasing degree of independence and personal responsibility. One of the plaintiff's expert witnesses was Dr. Walter Fox, Director of the Arizona Mental Health Department and former president of the Association of Medical Superintendents of Mental Hospitals. He had interviewed Donaldson and examined his hospital record. Fox testified that confining Donaldson to a locked building, with no opportunity for grounds privileges was not "consistent" with a treatment plan for a patient with Donaldson's history.

Gumanis denied Donaldson a privilege card, even after Donaldson had asked him for one. Fox testified that it would have been "standard psychiatric practice" to extend grounds privileges to a patient of Donaldson's background, condition, and history. Gumanis, in his testimony at trial, could not give a convincing explanation for his refusal of grounds privileges to Donaldson.[6]   At

---

6. Donaldson testified that he had once escaped from the hospital. This occurred around Christmastime 1957, shortly before

the end of the first year Donaldson had spent at Florida State. The hospital records, however, did not show that a fear

one point he sought to shift the responsibility for the refusal to O'Connor's shoulders, saying that he recalled having denied privileges after consultation with O'Connor. Later, he testified that at the time in question Donaldson had appeared to him to be "really upset", and that he had "probably" made the decision to deny Donaldson a privilege card on his own. Donaldson testified that soon after his transfer to Department C, Dr. Hanenson, the physician in charge of that department, gave him a privilege card.

The second form of treatment denied Donaldson was occupational therapy. Donaldson testified that Gumanis consistently refused to allow him to enter occupational therapy. This testimony was borne out by a progress note entered in Donaldson's hospital record January 17, 1964. Again, Fox testified that given what he called Donaldson's "social history", Donaldson would have been ideally suited to benefit from occupational therapy. According to Donaldson, Gumanis did not want him to go into occupational therapy, because Gumanis feared that he would learn touch-typing and would use this skill, in Donaldson's words, to "write writs", that is, to prepare habeas corpus petitions. Gumanis gave no reason why he denied Donaldson occupational therapy, although in the course of his testimony he did allude to the fact that he had done so. Not until Donaldson was transferred to Dr. Hanenson's care was he allowed to enter occupational therapy.

Third, the simplest and most routine form of psychiatric treatment is to have a patient talk with a psychiatrist. Donaldson testified that in the eighteen months O'Connor was in direct charge of his case, he spoke with O'Connor "not more than six times", and that the total time he spent talking to O'Connor did not consume more than one hour. He testified that in the eight and one-half years he spent under Gumanis' care, he did not speak with Gumanis more than a total of two hours—an average of about fourteen minutes a year. He testified that neither Gumanis nor O'Connor ever heeded his requests to discuss his case. On one occasion Gumanis said that he "talked only to patients that he wanted to". Gumanis did not recall that conversation. Once again, there was evidence to show that the situation improved when Donaldson was transferred to Dr. Hanenson's care. Donaldson testified that Hanenson managed to speak with him once a week, even though, according to Donaldson, patients were more numerous, psychiatrists fewer, and conditions worse in Hanenson's Department C than they had been in Gumanis's Department A.

B. *The defendants recklessly failed to attend to and treat Donaldson at precisely those junctures when treatment could have most helped Donaldson recover and therefore be released.*

The jury could have concluded that Donaldson should have been marked, at his entrance to the hospital, as a prime candidate for an early release, and that the defendants acted recklessly in failing to treat or attend to him during the early stage of his confinement. Fox testified that, given Donaldson's history,[7] he should have been "pegged" for an "early discharge". Moreover, a progress note entered by Gumanis after his first diagnostic interview with Donaldson, March 25, 1957, recorded that Donaldson "appeared" to be "in remission". Gumanis defined "remission" for the jury as a state "when the patient does not express

Donaldson would attempt to escape again motivated the denial of grounds privileges; nor have Gumanis and O'Connor asserted before this Court that such a fear was their reason for denying Donaldson a card.

7. Fourteen years before he was hospitalized in Florida, Donaldson had been hospitalized at the Marcy State Hospital in New York, with the same diagnosis as that made by the Florida doctors—"paranoid schizophrenic". On that occasion, Donaldson was released after three months.

delusions or paranoid ideas", and told the jury that it was hospital practice to release patients who were in remission. He testified that Donaldson was not released because he wanted to "observe [Donaldson] further". But after that interview the first progress note entered in Donaldson's hospital record is dated four months later; and the next report five months after that. Asked about this, Gumanis first replied, "When you have 900 patients you do that"; later, he insisted that he had seen Donaldson frequently, but had not recorded progress notes after each observation. The jury, however, could have discounted this testimony and concluded that Gumanis acted wantonly in giving a patient who had appeared to be "in remission" the same treatment he gave his 900 other patients.

C. *The defendants wantonly, maliciously, or oppressively blocked efforts by responsible and interested friends and organizations to have Donaldson released to their custody.*

At issue here are two efforts made to secure Donaldson's release, one by Helping Hands, Inc., a Minneapolis organization which runs halfway houses for mental patients and John H. Lembcke, a college friend of Donaldson.

1. *The Helping Hands' attempt to obtain Donaldson's release.*

Helping Hands made an inquiry to the hospital concerning the possibility of releasing Donaldson to its custody by a letter dated June 6, 1963:

We are interested in the possibility of signing out your patient, Kenneth Donaldson, and taking him as a resident at our halfway house at 3800 Columbus Avenue, Minneapolis. A maximum of six people live here, including our house mother, and myself, as president. At this time we have a room for Kenneth, who has interested us very much through his letters.

Enclosed with the letter was a brochure describing Helping Hands and a letter from the Minneapolis Clinic of Psychiatry and Neurology, stating that "it would be impossible in any of our State Hospitals for a patient to receive the type of attention and care" provided at Helping Hands. The author of this letter pointed out that the woman identified by the letterhead as the founder and director of Helping Hands had "rehabilitated well over a thousand over the years". The letter requested information concerning Donaldson's age, health, and "qualifications for work".

The hospital responded June 17, 1963, in a letter signed by O'Connor, then Clinical Director of the hospital. It gave Donaldson's age, and answered inquiries concerning his health and qualifications for work with the bare statement that Donaldson was "mentally incompetent at the present time". The crisp concluding paragraph read:

Should he [Donaldson] be released from this Hospital, he will require very strict supervision, which he would not tolerate. Such a release would be to the parents. We see no prospects of his release to any third party at any time in the near future.

The jury could have decided that Gumanis and O'Connor acted wantonly and maliciously in issuing this response, and that this conduct foreclosed an opportunity for Donaldson to win back at least a part of his freedom, and to gain access to a level of psychiatric treatment unavailable to him at the Florida Hospital. Each of the defendants sought to shift the responsibility for sending this curt reply to the other's shoulders. They discussed the question in terms of whether hospital rules, in general, fixed responsibility for deciding whether a patient could be furloughed by the attending physician, or the Superintendent or Clinical Director; they did not discuss it in terms of their recollections of the particular event. The jury would have been justified in finding the two jointly responsible for the incident.

## 2. The Lembcke attempt to obtain Donaldson's release.

John H. Lembcke, a certified public accountant in Binghamton, New York, who is married and has three children, had been a classmate of Donaldson's at Syracuse University in the 1920's. On four occasions, Lembcke sought to have Donaldson released to his custody. The first was on July 3, 1964, when Lembcke informed the hospital that Donaldson was a friend of his, and inquired whether there were "any conditions under which he would be released so that I could bring him back to New York State". The same day the hospital received the letter, O'Connor penciled a note to Gumanis that is attached to the letter in Donaldson's hospital record. The note said:

> This man must not be well himself to want to get involved with someone like this patient, who even the recent visiting psychologist considered *dangerous*—Recommend turn it down.

Rich, the new Clinical Director, wrote Lembcke saying that Donaldson had "shown no particular changes mentally", and that if released he would "require complete supervision".

The second inquiry came by letter of November 27, 1964. Again O'Connor appended a note to Gumanis that is in the hospital records. This note gave three reasons for denying Lembcke's request to have Donaldson released to him: parental consent would be required; the patient "would not stay with party mentioned"; and "we don't know anything about party". Gumanis prepared a letter, dated November 27 and again signed by Dr. Rich, "advis-[ing]" Lembcke that Donaldson would "require further hospitalization". The reply did not mention the three reasons for the denial set out in O'Connor's note, and did not request any further information from Lembcke, even though Lembcke in his November 23 letter had offered to provide any information the hospital should request.

The third attempt by Lembcke began with another letter to the hospital, dated December 21, 1965. According to Lembcke's testimony, the hospital responded by saying Donaldson could be released on two conditions: (1) that Lembcke would give Donaldson "adequate supervision" so that the release would not be detrimental to his mental health; and (2) that Lembcke would secure parental permission for Donaldson to go to New York with Lembcke. In May 1966, Lembcke went to Florida, and met with Gumanis and O'Connor. While in Florida he saw Donaldson and obtained from Donaldson's parents a letter dated May 14, 1966, giving their consent to Donaldson's being released to him. Nothing happened. In his testimony Lembcke did not explain how or why he came to abandon this 1966 effort to secure his friend's release.

Lembcke's final and most important effort to secure Donaldson's release began in March 1968. On March 21, the General Staff, at a meeting attended by Gumanis and Hanenson but not by O'Connor, recommended Donaldson's release on a trial visit or out-of-state discharge. On March 24, Lembcke wrote the hospital renewing his offer to take Donaldson. On March 28, the hospital responded, imposing three conditions on Donaldson's release: (1) that Lembcke be willing to come for Donaldson; (2) that he be willing to supervise Donaldson; and (3) that he be willing to take Donaldson to a psychiatrist if Donaldson needed treatment. By letter of March 31, Lembcke acceded to these conditions. On April 4, the hospital replied with a letter imposing two additional conditions: (1) a detailed statement concerning the home supervision Donaldson would be given; and (2) written authorization for the release from Donaldson's parents. Lembcke wrote back giving the hospital the information about home supervision it had requested. The hospital replied by again saying it would be necessary to obtain the written consent of Donaldson's parents.

On September 18, 1968, Lembcke wrote the hospital, enclosing a photocopy of the notarized written permission Donaldson's parents had signed May 14, 1966. The hospital responded in a letter dated September 24, signed by Dr. Rich. The letter informed Lembcke that Donaldson had been mentally ill for many years, that he "still express[ed] delusional thinking" and that "it would not be fair to you or to him to release him from the hospital at this time without adequate planning". The letter added, in its final paragraph, that it would be necessary for the hospital to have more recent authorization from Donaldson's nearest relative than the one Lembcke had proffered. At that point, Lembcke gave up; whenever he met the conditions imposed by the hospital officials, new conditions were imposed. As he put it, "after requirements were met, requirements were increased".

One other facet of Lembcke's last attempt to secure Donaldson's release bears mention. As noted, O'Connor did not attend the Staff Conference which had recommended Donaldson's release March 21. O'Connor first learned of the hospital's recommendation in June, when Donaldson wrote to the Division Director of the hospital concerning the effort being made to release him. The division director forwarded the letter to O'Connor, who in turn forwarded it to Hanenson, asking for information concerning the proposed release. Hanenson responded with a memorandum dated June 17. Across the bottom of this memorandum, O'Connor pencilled in the remark, "the record will show, I believe, we have been through this before and decided Mr. Lembcke would not properly supervise the patient". It was not clear when O'Connor supposed this "decision" to have been made, and in his deposition O'Connor was unable to locate any record of it in the hospital record. Moreover, there were suggestions in the record that Dr. O'Connor's conduct, in this and other respects, was influenced by his knowledge of Donaldson's history of writing letters to the press and to outside officials. From all of this evidence, the jury would have been justified in concluding that the frustration of Lembcke's effort to secure Donaldson's release in 1968 was entirely or primarily the result of O'Connor's bad faith intervention or, at the least, that the intervention was in reckless disregard of Donaldson's rights.

D. *The defendants continued to confine Donaldson knowing he was not dangerous, or with reckless disregard for whether he was dangerous.*

Three of the plaintiff's expert witnesses—Fox, Raymond D. Fowler, Jr., Chairman of the Psychology Department at the University of Alabama and former President of both the Alabama and Southern Psychological Associations, and Julian Davis, Director of the Psychology Department at the Florida State Hospital—testified that they did not believe Donaldson was dangerous. Fox's and Fowler's opinions were based upon the hospital records, Donaldson's pyschological reports, Donaldson's past history, and raw data from his physchological examinations. Lembcke testified that in his half century of having known Donaldson, he had never known Donaldson to be "violent", "aggressive", or "belligerent"; that, on the contrary, he knew Donaldson to be a "gentle" man. Dr. Walls testified that he did not believe Donaldson was physically dangerous; Gumanis himself conceded that he did not think Donaldson dangerous while Donaldson was in the hospital, although he said he could not predict what Donaldson would be like outside the hospital. There was no evidence in the record of Donaldson's ever having been violent in any way.

On the basis of this testimony the jury would have been justified in finding that Donaldson was non-dangerous, and in inferring that the defendants knew him to be so.

E. *The defendants did not do the best they could with available resources.*

As they did in the district court, the defendants on appeal pitch their defense in substantial part on their contention that they did the best they could with limited resources available to the state psychiatric hospital. Donaldson rebuts this contention, first, by pointing out the contrast between the treatment he received from the defendants and that he received from Hanenson. Hanenson allowed him grounds privileges and occupational therapy, spoke with him frequently, and within a year of taking charge of his case arranged a staff conference that recommended his release. Second, he relies on the testimony of Fox and the other experts to the effect that Gumanis and O'Connor failed to take steps that would have been open to them to take, even given the admittedly stark limitations on the resources available to them. We agree that these two considerations were a sufficient basis for the jury to reject the defendants' defense that they did the best they could with available resources.

We turn now to the novel and important question whether civilly committed mental patients have a constitutional right to treatment.

## II.

■ The theory of Donaldson's cause of action under section 1983 was set forth in three of the instructions given by the trial judge. The first, instruction number 34, was a variation of a standard form "boiler plate" instruction found in 2 Dewitt & Blackmer's Federal Jury Practice & Instructions, 1970, § 87.05 (2d ed.) This instruction stated that there were four basic elements Don-

aldson had to prove to make out a claim under § 1983: (1) that the defendants "confined plaintiff against his will, knowing that he was not mentally ill or dangerous, and knowing that if mentally ill he was not receiving treatment for his mental illness"; (2) that defendants "then and there acted under the color of state law"; (3) that defendants' "acts and conduct deprived the plaintiff of his federal constitutional right not to be denied his liberty without due process of law as that phrase is defined and explained in these instructions"; and (4) that the defendants' "acts and conduct were the proximate cause of injury and consequent damage to the plaintiff". The other two instructions, 37 and 38, were the relevant instructions "defin[ing] and explain[ing]" the "phrase", "federal constitutional right not to be denied or deprived of his liberty without due process of law", within the meaning of instruction 34. These instructions told the jury:

37. You are instructed that a person who is involuntarily civilly committed to a mental hospital does have a constitutional right to receive such individual treatment as will give him a realistic opportunity to be cured or to improve his mental condition.

38. The purpose of involuntary hospitalization is treatment and not mere custodial care or punishment if a patient is not dangerous to himself or others. Without such treatment there is no justification, from a constitutional standpoint, for continued confinement.

The propriety of these two instructions is the heart of the question raised by both O'Connor and Gumanis in their appeals.[8]

---

8. As a threshhold matter, Donaldson suggests that the objections to these instructions are not properly before this Court. He notes that the defendants did not object to that instruction either when the proposed instructions were discussed in chambers, or after the charge was read to the jury. The

defendants did, however, object to what were then the plaintiff's proposed instructions 37 and 38 in a pretrial brief filed before the Court. There they asked that those instructions be replaced with an instruction that "[y]ou are instructed that a person who is committed to a mental hospital has a right

■ The question for decision, whether patients involuntarily civilly committed in state mental hospitals have a constitutional right to treatment, has never been addressed by any of the federal courts of appeals. Four district courts, however, have decided the question within the last three years, three of which held that there is a constitutional right to treatment.[9] The Court of Appeals for the District of Columbia Circuit, in a landmark case decided eight years ago, took note in dictum of the existence and seriousness of the question, although in the same case the court held that the Hospitalization of the Mentally Ill Act of 1964[10] creates a *statutory* right to treatment on the part of mental patients in the District of Columbia.[11] The idea of a constitutional right to treatment has received an unusual amount of scholarly discussion and support,[12] and there is now an enormous range of precedent relevant to, although

to be released through judicial process when through no fault of his own treatment is not afforded and he is not dangerous to society or to himself". The trial judge refused this request, and gave the two instructions as the plaintiffs had proposed them. It is settled that "a failure to object may be disregarded if a party's position has previously been made clear to the court and it is plain that a further objection would be unavailing". 9 C. Wright & A. Miller, Federal Practice & Procedure § 2553 at 639–40; see, *e. g.*, Mays v. Dealers Transit, 7 Cir. 1971, 441 F.2d 1344; Steinhauser v. Hertz Corp., 2 Cir. 1970, 421 F.2d 1169. We find that was the case here, and therefore we consider that the objections are properly before the Court.

9. Two cases hold that there is a right to treatment for civilly committed mentally ill patients. Wyatt v. Stickney, M.D.Ala.1971, 325 F.Supp. 781, *on submission of proposed standards by defendants*, 334 F.Supp. 1341, enforced, 1972, 344 F.Supp. 373, 387, appeal docketed sub nom., Wyatt v. Aderholt, No. 72–2634, 5 Cir. Aug. 1, 1972; Stachulak v. Coughlin, N.D.Ill., 1973, 364 F.Supp. 686. One has held civilly committed mentally ill patients enjoy no right to treatment. Burnham v. Department of Public Health, N.D. Ga.1972, 349 F.Supp. 1335, appeal docketed, No. 72–3110, 5 Cir. Oct. 4, 1972.

A fourth case has recently held that civilly committed mentally retarded patients have a right to treatment. Welsch v. Likins, No. 4–72–Civ. 451, D.Minn. Feb. 15, 1974, 373 F.Supp. 487.

10. D.C.Code Ann. § 21–501.

11. Rouse v. Cameron, 1966, 125 U.S.App.D. C. 366, 373 F.2d 451. Chief Judge Bazelon wrote for the Court:

Absence of treatment "might draw into question 'the constitutionality of [this] mandatory commitment section' as applied." (1) Lack of improvement raises a question of procedural due process where the commitment is under D.C.Code § 24–301 rather than under the civil commitment statute, for under § 24–301 commitment is summary, in contrast with civil commitment safeguards. It does not rest on any finding of present insanity and dangerousness but, on the contrary, on a jury's reasonable doubt that the defendant was sane when he committed the act charged. Commitment on this basis is permissible because of its humane therapeutic goals. (2) Had appellant been found criminally responsible, he could have been confined a year, at most, however dangerous he might have been. He has been confined four years and the end is not in sight. Since this difference rests only on need for treatment, a failure to supply treatment may raise a question of due process of law. It has also been suggested that a failure to supply treatment may violate the equal protection clause. (3) Indefinite commitment without treatment of one who has been found not criminally responsible may be so inhumane as to be "cruel and unusual punishment." [Footnotes and citations omitted]

Id. at 453.

12. The seminal article in the field is Birnbaum, The Right to Treatment, 1960, 46 A. B.A. Journal 499. Much of the commentary in the area was stimulated by the *Rouse* decision. *E. g.*, Symposium—The Right to Treatment, 1969, 57 Geo.L.J. 673 (11 articles, 218 pages); Bazelon, Implementing the Right to Treatment, 1969, 36 U.Chi.L.Rev. 742; Birnbaum, Some Remarks on "The Right to Treatment," 1971, 23 Ala.L.Rev. 623; Chambers, Alternatives to Civil Commitment of the Mentally Ill: Practical Guides and Constitutional Imperatives, 1969, 70 Mich.L.Rev. 1108; Katz, The Right to Treatment—An Enchanting Legal Fiction? 1969, U.Chi.L.Rev. 755; Drake, Enforcing the Right to Treatment: Wyatt v. Stickney, 1972, 10 Am.Crim.L.Rev. 587; Morris, "Criminality" and the Right to Treatment, 1969, U.Chi.L.Rev. 784; Note, The Nascent Right to Treatment, 1967, 53 Va.L.Rev.

not squarely in point with, the issue.[13] The idea has been current at least since 1960, since the publication in the May 1960 issue of the American Bar Association Journal of an article by Dr. Morton Birnbaum, a forensic medical doctor now generally credited with being the father of the idea of a right to treatment.[14] The A.B.A. Journal editorially endorsed the idea shortly after the publication of Dr. Birnbaum's article.[15]

We hold that a person involuntarily civilly committed to a state mental hospital has a constitutional right to receive such individual treatment as will give him a reasonable opportunity to be cured or to improve his mental condition.

In reaching this result, we begin by noting the indisputable fact that civil commitment entails a "massive curtailment of liberty" in the constitutional sense. Humphrey v. Cady, 1972, 405 U. S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394. The destruction of an individual's personal freedoms effected by civil commitment is scarcely less total than that effected by confinement in a penitentiary. Indeed, civil commitment, because it is for an indefinite term, may in some ways involve a more serious abridgement of personal freedom than imprisonment for commission of a crime usually does. Civil commitment involves stigmatizing the affected individuals, and the stigma attached, though in theory less severe than the stigma attached to criminal conviction, may in reality be as severe, or more so.[16] Since civil commitment involves deprivations of liberty of the kind with which the due process clause is frequently concerned, that clause has the major role in regulating government actions in this area.

Beyond this, the conclusion that the due process clause guarantees a right to treatment rests upon a two-part theory. The first part begins with the fundamental, and all but universally accepted, proposition that "any nontrivial governmental abridgement of [any] freedom [which is part of the 'liberty' the Fourteenth Amendment says shall not be denied without due process of law] must be justified in terms of some 'permissible governmental goal.'" Tribe, Foreward—Toward a Model of Roles in the Due Process of Life and Law, 86 Harv. L.Rev. 1, 17 (1973). Once this "fairly sweeping concept of substantive due process" is assumed, *id.* at 5 n. 26,[17] the next step is to ask precisely what government interests justify the massive abridgement of liberty civil commitment entails. Typically, three distinct grounds for civil commitment are recognized by state statutes: danger to self; danger to others; and need for treatment, or for "care", "custody", or "supervision". Jackson v. Indiana, 1972, 406 U.S. 715, 737, 92 S.Ct. 1845, 32 L. Ed.2d 435; see Note, Civil Commitment of the Mentally Ill: Theories and Procedures, 1966, 79 Harv.L.Rev. 1288, 1289–97; Note, The Nascent Right to Treatment, 1967, 53 Va.L.Rev. 1134, 1138–39.[18] It is analytically useful to conceive

---

1134; Note, Civil Restraint, Mental Illness, and the Right to Treatment, 1967, 77 Yale L.J. 87; 80 Harv.L.Rev. 898 (1967).

13. See cases cited at nn. 23–44 *infra*.

14. Birnbaum, The Right to Treatment, 1960, 46 A.B.A.J. 499.

15. Editorial, A New Right, 1960, 46 A.B.A.J. 516.

16. On the recognition that stigmatization constitutes a deprivation of liberty in the constitutional sense, see Board of Regents v. Roth, 1972, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548, 558–559.

17. *See also* Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 1973, 82 Yale L.J. 920, 935 & n. 91; Roe v. Wade, 1973, 410 U.S. 113, 172–173, 93 S.Ct. 705, 35 L. Ed.2d 147 (Rehnquist, J., dissenting); Doe v. Bolton, 1973, 410 U.S. 179, 223, 93 S.Ct. 739, 35 L.Ed.2d 201 (White, J., dissenting).

18. In *Jackson*, the Supreme Court, relying upon an American Bar Foundation study, found that in nine states the sole criterion for involuntary commitment was the danger to self or others; that in 18 other states the patient's need for care or treatment was an alternative basis; that the need for care

of these grounds as falling into two categories, one consisting of a "police power" rationales for confinement, the other of a *"parens patriae"* rationales.[19] Danger to others is a "police power" rationale; need for care or treatment a *"parens patriae"* rationale. Danger to self combines elements of both.

The key point of the first part of the theory of a due process right to treatment is that where, as in Donaldson's case, the rationale for confinement is the *"parens patriae"* rationale that the patient is in need of treatment, the due process clause requires that minimally adequate treatment be in fact provided. This in turn requires that, at least for the nondangerous patient, constitutionally minimum standards of treatment be established and enforced. As Judge Johnson expressed it in the *Wyatt* case: "To deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process." Wyatt v. Stickney, *supra*, 325 F.Supp. at 785. Or as Justice Cutter, speaking for the Supreme Judicial Court of Massachusetts, put it: "Convinement of mentally ill persons, not found guilty of crime, without affording them reasonable treatment also raises serious questions of deprivation of liberty without due process of law. As we said in the *Page* case [citation omitted], of a statute permitting comparable confinement, 'to be sustained as a nonpenal statute . . . it is necessary that the remedial aspect of confinement . . . have foundation in fact.' " Nason v. Superintendent, Bridgewater Hospital, 1968, 353 Mass. 604, 612, 233 N.E.2d 908, 913. This key step in the theory also draws considerable support from, if indeed it is not compelled by, the Supreme Court's recent decision in Jackson v. Indiana, 1972, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435. In *Jackson*, the Supreme Court established the rule that "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purposes for which the individual is committed". 406 U.S. at 738.[20] If the "purpose" of commitment is treatment, and treatment is not provided, then the "nature" of the commitment bears no "reasonable relation" to its "purpose", and the constitutional rule of *Jackson* is violated.

This much represents the first part of the theory of a due process right to treatment; persons committed under what we have termed a *parens patriae* ground for commitment must be given treatment lest the involuntary commitment amount to an arbitrary exercise of government power proscribed by the due process clause. The second part of the theory draws no distinctions between persons committed under *"parens patriae"* rationales and those committed under "police power" rationales. This

---

or treatment was the sole basis in six other states; and a few states had no statutory criteria at all and "presumably le[ft] the determination to judicial discretion". 406 U.S. at 737 n. 19, citing American Bar Foundation, The Mentally Disabled and the Law (rev.ed.1971) at 36–49.

19. See Note, The Nascent Right to Treatment, 1967, 53 Va.L.Rev. 1134, 1138–39.

20. *Jackson* involved a mentally defective deaf mute who was committed after the court determined that he was incompetent to stand trial. Since the mental and physical defects which were the cause of his inability were not susceptible to treatment and not likely to improve during his confinement, it was unlikely that he would ever become competent to stand trial. In the circumstances, the Supreme Court held that its rule that "the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed" permitted the state to confine Jackson under the provisions for the commitment of those found incompetent to stand trial only for "the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity [to stand trial] in the foreseeable future". It held further that even if it were determined that he was likely to become able to stand trial, "his continued commitment [would have to be] justified by progress toward that goal". 406 U.S. at 738.

part begins with the recognition that, under our system of justice, long-term detention is, as a matter of due process, generally permitted only when an individual is (1) proved, in a proceeding subject to the rigorous constitutional limitations of the due process clause of the fourteenth amendment and the Bill of Rights, (2) to have committed a *specific act* defined as an offense against the state. See Powell v. Texas, 1968, 392 U.S. 514, 533, 542–543, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (Black, J., concurring). Moreover, detention, under the criminal process, is usually allowed only for a period of time explicitly fixed by the prisoner's sentence. The second part of the theory of a due process right to treatment is based on the principle that when the three central limitations on the government's power to detain— that detention be in retribution for a specific offense; that it be limited to a fixed term; and that it be permitted after a proceeding where fundamental procedural safeguards are observed—are absent, there must be a *quid pro quo* extended by the government to justify confinement.[21] And the *quid pro quo* most commonly recognized is the provision of rehabilitative treatment, or, where rehabilitation is impossible, minimally adequate habilitation and care, beyond the subsistence level custodial care that would be provided in a penitentiary.[22]

This second part of the theory draws a wide range of support from a variety of precedents. The relevant cases have arisen in five major procedural contexts.

The earliest group of relevant cases consists of cases decided on habeas corpus petitions brought by citizens held under provisions for various kinds of "nonpenal" confinement, who were being held in correctional facilities for prisoners convicted of crimes. These cases uniformly held that, where detention is "nonpenal" in theory, the very least that

---

21. In Welsch v. Likins, 1974, 373 F.Supp. 487, the District of Minnesota described, and rejected, a different *quid pro quo* rationale for a right to treatment. We also reject the rationale described by the *Welsch* court, and the rationale we embrace should be carefully contrasted with it:

> One theory is that commitment pursuant to civil statutes generally lacks the procedural safeguards afforded those charged with criminal offense. The constitutional justification for this abridgment of *procedural rights* is that the purpose of commitment is treatment. (Emphasis supplied).

Welsch v. Likins, 373 F.Supp. at 496. *See also* Inmates of Boys' Training School v. Affleck, D.R.I.1972, 346 F.Supp. 1354, 1368; Rouse v. Cameron, 1966, 125 U.S.App.D.C. 366, 373 F.2d 451, 453 (Bazelon, C. J.); Note, Civil Restraint, Mental Illness, and the Right to Treatment, 1967, 77 Yale L.J. 87, 90–91, 102–03 & nn. 62–63.

22. Adequate and effective treatment is constitutionally required because, absent treatment, the hospital is transformed "into a penitentiary where one could be held indefinitely for no convicted offense." Wyatt v. Stickney, M.D.Ala.1971, 325 F.Supp. 781, 784, quoting Ragsdale v. Overholser, 1960, 108 U.S.App.D.C. 308, 281 F.2d 943, 950 (Fahy, J., concurring).

Of the various formulations of this *"quid pro quo"* theory we have found, perhaps the most successful is that made by Professor Nicholas Kittrie, writing specifically about confinement of juveniles, but articulating a theory equally applicable to civil commitment of mentally ill persons:

> Our society has increasingly divested certain groups from the traditional criminal justice court and, acting under its asserted role of *parens patriae*, substituted new therapeutic controls.

> \*      \*      \*      \*      \*

> A new concept of substantive due process is evolving in [this] therapeutic realm. This concept is founded upon a recognition of the concurrency between the state's exercise of sanctioning powers and its assumption of the duties of social responsibility. Its implication is that effective treatment must be the *quid pro quo* for society's right to exercise its *parens patriae* controls. Whether specifically recognized by statutory enactment or implicitly derived from the constitutional requirements of due process, the right to treatment exists.

Kittrie, Can the Right to Treatment Remedy the Ills of the Juvenile Process? 1969, 57 Geo.L.J. at 851–52, 870.

is required is that the persons be confined in a facility other than a prison.[23]

Later cases expand the view of these cases by holding not only that persons held under provisions for "nonpenal" confinement be held elsewhere than in a prison, but that they must be held in places where the conditions are *actually* therapeutic.[24]

The third line of relevant cases are those where the constitutionality of various modern "nonpenal" statutes—notably sex-offender and defective-delinquent statutes—provide for the confinement of habitual criminal offenders to protect society and to provide rehabilitative care. The decisions have upheld such statutes, but the courts have usually added the proviso that the constitutionality of the statute is conditioned upon the *realization* of the statutory promise of rehabilitative treatment.[25]

The fourth set of cases, highlighted by Rouse v. Cameron [26] and Nason v. Superintendent of Bridgewater State Hospital,[27] consists of cases where individuals under confinement have brought habeas corpus petitions challenging their confinement on the ground that they were not receiving treatment. This is a diverse group of cases; in most of them, the challenge to confinement for lack of treatment has been combined with challenges brought on other grounds, and often the other grounds are the subject of the decisions. Among these cases, however, we have found none where any court has declared that no right to treatment exists, and we have found none explicitly recognizing a *constitutional* right to treatment. When they hold that there is a right to treatment, the cases usually either rest on statutory grounds, or are ambiguous as to whether they are resting upon statutory or con-

23. Benton v. Reid, 1956, 98 U.S.App.D.C. 27, 231 F.2d 780; Commonwealth v. Page, 1958, 339 Mass. 313, 159 N.E.2d 82; In re Maddox, 1958, 351 Mich. 358, 88 N.W.2d 470; cf. Miller v. Overholser, 1953, 92 U.S.App. D.C. 110, 206 F.2d 415.

24. But this mandatory commitment provision rests upon a supposition, namely, the necessity for treatment of the mental condition which led to the acquittal by reason of insanity. And this necessity for treatment presupposes in turn that treatment will be accorded.
Ragsdale v. Overholser, 1960, 108 U.S.App.D. C. 308, 281 F.2d 943, 950 (Fahy, J., concurring), quoted with approval, Darnell v. Cameron, 1965, 121 U.S.App.D.C. 58, 348 F.2d 64, 67–68, (Bazelon, C. J.); Sas v. Maryland, 4 Cir. 1964, 334 F.2d 506, 517, cert. dismissed as improvidently granted sub nom., Murel v. Baltimore City Crim.Ct., 1972, 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791; Commonwealth v. Page, 1959, 339 Mass. 313, 317, 159 N.E.2d 82, 85.

25. For those in the category [of defective delinquents] it [the defective delinquents statute] would substitute psychiatric treatment for punishment in the conventional sense and would free them from confinement, not when they have "paid their debt to society," but when they have been sufficiently cured to make it reasonably safe to release them. With this humanitarian and progressive approach to the problem no person who has deplored

the inadequacies of conventional penological practices can complain. But a statute though "fair on its face and impartial in appearance" may be fraught with the possibility of abuse in that if not administered in the spirit in which it is conceived it can become a mere device for warehousing the obnoxious and antisocial elements of society. . . . *Deficiencies in staff, facilities, and finances would undermine the efficacy of the Institution and the justification for the law, and ultimately the constitutionality of its application.* [Footnotes omitted]
Sas v. Maryland, 4 Cir. 1964, 334 F.2d 506, 517, cert. dismissed as improvidently granted sub nom. Murel v. Baltimore City Crim.Ct. 1972, 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed. 2d 791 (emphasis supplied).
*See also* Davy v. Sullivan, M.D.Ala.1973, 354 F.Supp. 1320 (sex offender statute) (three-judge court)

26. 1966, 125 U.S.App.D.C. 366, 373 F.2d 451 (Bazelon, C. J.). The District of Columbia Circuit has reaffirmed its *Rouse* holding on numerous occasions. See, e. g., In re Curry, 1971, 147 U.S.App.D.C. 28, 452 F.2d 1360; Covington v. Harris, 1969, 136 U.S.App.D.C. 35, 419 F.2d 617; Tribby v. Cameron, 1967, 126 U.S.App.D.C. 327, 379 F.2d 104; Dobson v. Cameron, 127 U.S.App.D.C. 324, 383 F.2d 519; Millard v. Cameron, 1966, 125 U. S.App.D.C. 383, 373 F.2d 468.

27. 353 Mass. 604, 233 N.E.2d 908 (1968) (Cutter, J.).

stitutional grounds.[28] But in all cases, the courts have at least sustained the right of a petitioner to a hearing to develop the facts supporting his claim that he is not receiving treatment.[29]

Fifth, and last, among the groups of cases is the spate of recent cases brought as class actions in federal court, seeking broad forms of injunctive and declaratory relief requiring that adequate treatment be provided in state-run facilities. The cases have included attacks on conditions in many types of facilities—including facilities for the mentally ill,[30] the mentally retarded,[31] juvenile delinquents [32] or nondelinquent ju-

veniles held as being "persons in need of supervision".[33]

Taken together, these five sets of cases constitute a near unanimous recognition that governments must afford a *quid pro quo* when they confine citizens in circumstances where the conventional limitations of the criminal process are inapplicable. These five groups include cases decided by all levels of courts—the Supreme Court,[34] the courts of appeals,[35] the federal district courts,[36] and the state courts.[37] One or another of them concerns each of the major forms of "nonpenal confinement: from those with a heavy police power emphasis, such as confinement of sex offenders [38]

---

28. *But see* Stachulak v. Coughlin, N.D.Ill. 1973, 364 F.Supp. 686, a case of this kind, citing *Wyatt* and holding there is a constitutional right to treatment.

29. *E. g.*, Humphrey v. Cady, 1972, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (characterizing committed sex offender's claim that he was not receiving treatment a "substantial constitutional claim", and remanding for a hearing on, inter alia, that issue).

30. See cases cited in note 9 *supra*.

31. Wyatt v. Stickney, M.D.Ala.1972, 344 F. Supp. 387; Welsch v. Likins, D.Minn.1974, 373 F.Supp. 487. *Contra*, New York State Ass'n for Retarded Children, Inc. v. Rockefeller, E.D.N.Y.1973, 357 F.Supp. 752.

32. Nelson v. Heyne, 7 Cir. 1974, 491 F.2d 352, aff'g N.D.Ind.1972, 355 F.Supp. 451; Inmates of Boys' Training School v. Affleck, D.R.I.1972, 346 F.Supp. 1354; Morales v. Turman, E.D.Tex.1973, 364 F.Supp. 166.

33. Martarella v. Kelley, S.D.N.Y.1972, 349 F.Supp. 575, enforced, 359 F.Supp. 478.
The closest the Supreme Court has come to speaking directly on the second, more important part of the due process right to treatment theory we articulate, came in In re Gault, 1967, 387 U.S. 1, 22 n. 30, 87 S.Ct. 1428, 18 L.Ed.2d 527, in which the Court, discussing the context of juvenile confinement, wrote:
> While we are concerned only with procedure before the juvenile court in this case, it should be noted that to the extent that the special procedures for juveniles are thought to be justified by the special consideration and treatment afforded them,

there is reason to doubt that juveniles always receive the benefits of such a *quid pro quo* . . . The high rate of juvenile recidivism casts some doubt upon the adequacy of treatment afforded juveniles

. . .

> In fact some courts have recently indicated that appropriate treatment is essential to the validity of juvenile custody, and therefore that a juvenile may challenge the validity of his custody on the ground that he is not in fact receiving any special treatment.

34. Jackson v. Indiana, 1972, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435; Humphrey v. Cady, 1972, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394; McNeil v. Director, Patuxent Institution, 1972, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719.

35. *E. g.*, Nelson v. Heyne, *supra* note 39; Sas v. Maryland, 4 Cir. 1964, 334 F.2d 506, cert. dismissed as improvidently granted sub nom., Murel v. Baltimore City Crim.Ct., 1972, 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed. 2d 791; Rouse v. Cameron, 1966, 125 U.S. App.D.C. 366, 373 F.2d 541.

36. *E. g.*, cases cited in nn. 9, 31–33, *supra*.

37. *E. g.*, Nason v. Superintendent, Bridgewater Hospital, 1968, 353 Mass. 604, 233 N.E. 2d 908; Commonwealth v. Page, 1959, 339 Mass. 313, 159 N.E.2d 82; In re Maddox, 1958, 351 Mich. 358, 88 N.W.2d 470.

38. *E. g.*, Humphrey v. Cady, 1972, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394; Davy v. Sullivan, M.D.Ala.1973, 354 F.Supp. 1320 (three-judge court); Commonwealth v. Page, 1959, 339 Mass. 313, 159 N.E.2d 82.

or defective delinquents,[39] of persons acquitted by reason of insanity,[40] or of persons held incompetent to stand trial;[41] those with a heavy *parens patriae* emphasis, such as confinement of the mentally retarded,[42] or of juveniles;[43] and those—such as civil commitment of the mentally ill[44]—with elements of both rationales behind them.

The appellants argue strenuously that a right to constitutionally adequate treatment should not be recognized, because such a right cannot be governed by judicially manageable or ascertainable standards. In making the argument, they rely heavily upon the Northern District of Georgia's decision in Burnham v. Department of Public Health, 1972, 349 F.Supp. 1335, 1341–1343. In *Burnham*, the district judge held that a class action seeking declaratory and injunctive relief requiring the Georgia Department of Public Health to provide treatment at Georgia mental hospitals presented a nonjusticiable controversy. He quoted Baker v. Carr, 1962, 369 U.S. 186, 198, 82 S.Ct. 691, 700, 7 L.Ed.2d 663, for the proposition that determining whether a suit was justiciable requires determining whether "the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded". 349 F. Supp. at 1341, quoting 369 U.S. at 198. He then cited the ambiguity of the dictionary definition of treatment, a passage from a law review article noting the fact that there are as many as forty different methods of psychotherapy,[45] and a passage from the Supreme Court's decision in Greenwood v. United States, 1956, 350 U.S. 366, 76 S.Ct. 410, 100 L. Ed. 412, concerning the "tentativeness" and "uncertainty" of "professional judgment" in the mental health field.[46] He concluded: "[T]he claimed duty (i. e. to 'adequately' or 'constitutionally treat') defies judicial identity and therefore prohibits its breach from being judicially defined." 349 F.Supp. at 1342.

The defendants' argument can be answered on two levels. First, we doubt whether, even if we were to concede that

39. *E. g.*, Sas v. Maryland, 4 Cir. 1964, 334 F.2d 506, cert. dismissed as improvidently granted sub nom., Murel v. Baltimore City Crim.Ct., 407 U.S. 355, 92 S.Ct. 2091, 32 L. Ed.2d 791.

40. *E. g.*, Rouse v. Cameron, 1966, 125 U.S. App.D.C. 366, 373 F.2d 451 (Bazelon, C. J.); Darnell v. Cameron, 1965, 121 U.S.App. D.C. 58, 348 F.2d 64 (Bazelon, C. J.); Ragsdale v. Overholser, 1960, 108 U.S.App. D.C. 308, 281 F.2d 943 (Burger, J.).

41. Jackson v. Indiana, 1972, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435. *See also* Greenwood v. United States, 1956, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412; United States v. Pardue, D.Conn.1973, 354 F.Supp. 1377; United States v. Jackson, N.D.Cal.1969, 306 F.Supp. 4.

42. *E. g.*, Wyatt v. Stickney, M.D.Ala.1972, 344 F.Supp. 387; Welsch v. Likins, No. 4–72–Civ. 451, D.Minn. Feb. 15, 1974, noted, 42 U.S.L.W. 1141–42.

43. Cases cited in notes 32–33.

44. Cases cited in note 9 *supra*.

45. Levine [M. Levine, Psychotherapy in Medical Practice] lists 40 methods of psychotherapy. Among these, he includes physical treatment, medicinal treatment, reassurance, authoritative firmness, hospitalization, ignoring of certain symptoms and attitudes, satisfaction of neurotic needs and bibliotherapy. In addition, there are physical methods of psychiatric therapy, such as the prescription of sedatives and tranquilizers, the induction of convulsions by drugs and electricity, and brain surgery. *Obviously, the term "psychiatric treatment" covers everything that may be done under medical auspices—and more.*
   If mental treatment is all the things Levine and others tell us it is, how are we to determine whether or not patients in mental hospitals receive adequate amounts of it?
   Szasz, The Right to Psychiatric Treatment: Rhetoric and Reality, 1969, 57 Geo.L.J. 740, 741.

46. . . . [T]heir [two court-appointed psychiatrists] testimony illustrates the uncertainty of diagnosis in this field and the tentativeness of professional judgment. The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment.
   Greenwood v. United States, 1956, 350 U.S. 366, 375, 76 S.Ct. 410, 415, 100 L.Ed. 412.

courts are incapable of formulating standards of adequate treatment in the abstract, we could or should for that reason alone hold that no right to treatment can be recognized or enforced. There will be cases—and the case at bar is one—where it will be possible to make determination whether a given individual has been denied his right to treatment without formulating in the abstract what constitutes "adequate" treatment. In this case, the jury properly could have concluded that Donaldson had been denied his rights simply by comparing the treatment he received while he was under Gumanis's and O'Connor's care with that he received while under Hanenson's care; or it could have concluded that Donaldson's rights had been violated on the basis of the evidence that the defendants obstructed his release even though they knew he was receiving no treatment. Neither judgment required any *a priori* determination of what constitutes or would have constituted adequate treatment, and of course no such determination was made.

We do not, however, concede that determining what constitutes adequate treatment is beyond the competence of the judiciary. In deciding in individual cases whether treatment is adequate, there are a number of devices open to the courts, as Judge Bazelon noted in discussing the implementation of the statutory right to treatment in the landmark case of Rouse v. Cameron:

> But lack of finality [of professional judgment] cannot relieve the court of its duty to render an informed decision. Counsel for the patient and the government can be helpful in presenting pertinent data concerning standards for mental care, and, particularly when the patient is indigent and cannot present experts of his own, the court may appoint independent experts. Assistance might be obtained from such sources as the American Psychiatric Association, which has published standards and is continually engaged in studying the problems of mental care. The court could also consider inviting the psychiatric and legal communities to establish procedures by which expert assistance can be best provided. [Footnotes omitted].

373 F.2d at 457. There are by now many cases where courts have undertaken to determine whether treatment in an individual case is adequate or have ordered that determination to be made by a trial court.[47] Even in cases like *Wyatt* and *Burnham*, when courts are asked to undertake the more difficult task of fashioning institution-wide standards of adequacy, the task should not be beyond them. The experience of the *Wyatt* case bears this out. In *Wyatt*, agreement was reached among the parties on almost all of the minimum standards for adequate treatment ordered by the district court, and the defendants joined in submitting the standards to the district court. These stipulated standards were supported and supplemented by testimony from numerous expert witnesses. Moreover, there was a striking degree of consensus among the experts, including the experts presented by the defendants, as to the minimum standards for adequate treatment. The standards developed have not been challenged by the defendants in the appeal now pending before this Court. See

---

47. See, *e. g.*, Humphrey v. Cady, 1972, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394; In re Curry, 1971, 147 U.S.App.D.C. 28, 452 F.2d 1360; United States v. Waters, 1970, 141 U.S.App.D.C. 289, 437 F.2d 722; Dobson v. Cameron, 1967, 127 U.S.App.D.C. 324, 383 F.2d 519; Tribby v. Cameron, 126 U.S. App.D.C. 327, 379 F.2d 104; Millard v. Cameron, 1966, 125 U.S.App.D.C. 383, 373 F.2d 468; Sas v. Maryland, 4 Cir. 1964, 334 F.2d 506, remanding, D.Md., 1969, 295 F. Supp. 389, aff'd sub nom., Tippett v. Maryland, 1971, 436 F.2d 1153, cert. dismissed as improvidently granted sub nom., Murel v. Baltimore City Crim.Ct.1972, 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791; Dixon v. Atty. Gen'l of Pennsylvania, M.D.Pa.1971, 325 F.Supp. 966 (three-judge); In re Jones, D.D.C.1972, 338 F.Supp. 428; Clatterbuck v. Harris, D.D.C.1968, 295 F.Supp. 84; Nason v. Supt. of Bridgewater State Hospital, 1968, 353 Mass. 604, 233 N.E.2d 908.

Wyatt v. Stickney, M.D.Ala.1972, 344 F. Supp. 373, 375–376.

In summary, we hold that where a nondangerous patient is involuntarily civilly committed to a state mental hospital, the only constitutionally permissible purpose of confinement is to provide treatment, and that such a patient has a constitutional right to such treatment as will help him to be cured or to improve his mental condition. We hold that the district court did not err in so instructing the jury.

### III.

■ Gumanis and O'Connor join in contending that the evidence at trial did not permit the jury to find that they acted in bad faith, and that therefore they cannot be held personally liable for Donaldson's injuries or the deprivations of his constitutional rights. Gumanis's arguments concern primarily his role in deciding whether Donaldson could or should be released. He asserts that he acted throughout in good faith and in the reasonable belief that Donaldson was mentally ill and required further confinement. O'Connor's argument is directed not only toward his acts affecting the decision whether to release, but also to the entirety of his conduct while Donaldson was held at Florida State. O'Connor argues that both he and Gumanis did the best they could with available resources, and therefore should not be held personally liable for whatever was done to Donaldson. He cites in his brief the various limitations of staff and funds available to the state psychiatrists at Florida State, the difficulties hospital administrators have had in winning approval of their budgets from the state legislatures, and similar matters; and he argues, on that basis, that the denial of whatever right to treatment Donaldson had was the product of the actions of the legislature and of the realities of the budgetary situation, and not of the actions of the state psychia-

trists to whose care Donaldson was entrusted.

We find the appellants' objection, in all of its various forms, without merit.

The trial judge instructed the jury:

The defendants in this action rely on the defense that they acted in good faith. Simply put, defendants contend they in good faith believed it was necessary to detain plaintiff in the Florida State Hospital for treatment for the length of time he was so confined. If the jury should believe from a preponderance of the evidence that defendants reasonably believed in good faith the detention of plaintiff was proper for the length of time he was confined then a verdict for defendants should be entered even though the jury may find the detention to have been unlawful.

However, mere good intentions which do not give rise to a reasonable belief that detention is lawfully required cannot justify plaintiff's confinement in the Florida State Hospital. As a corollary plaintiff here need not show malice or ill-will to prove his action under the Civil Rights Act. All that is required is that he demonstrate state action which amounts to an actual deprivation of constitutional rights or other rights guaranteed by law.

The defendants did not object to this instruction, and do not challenge its correctness here.[48] The instruction was proper, and there was sufficient evidence to support a jury finding that the defendants did not act at all times in a good faith and reasonable belief that Donaldson needed continued confinement and that continued confinement was lawful. In effect, the jury found, on the facts, that Donaldson's right to treatment was denied not or not only by the limitations of funds and staff and resources under which the hospital operated, but also by the actions of Gumanis and O'Connor themselves.

48. Dowsey v. Wilkins, 5 Cir 1972, 467 F.2d 1022, 1025–1026.

We are "duty bound to accept all evidence in favor of the verdict as true and to give such evidence the benefit of all permissible inferences that would help sustain the jury's decision". Little v. Green, 5 Cir. 1970, 428 F,2d 1061, cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L. Ed.2d 384; Grey v. First National Bank, 5 Cir. 1968, 393 F.2d 371, 381. We hold therefore that the evidence supported the jury's finding that the defendants did not act in good faith.

### IV.

The first contention made by Gumanis alone is that the Northern District of Florida's jury selection plan operated to abridge his right to a jury trial under the seventh amendment and under 28 U. S.C. §§ 1861, 1862, by permitting the "systematic exclusion" of physicians from the jury rolls. Gumanis raised his objection to the composition of the jury on the first day of the trial, but after the jury had been impanelled and sworn. The Northern District selection plan allows certain specified classes of person, including "actively engaged members of the clergy" and "actively practicing attorneys, physicians, and dentists, and registered nurses", to be excused from jury duty if they so desire. The authority for these exceptions is an express provision of the Jury Selection and Service Act. 28 U.S.C. § 1863(b)(5) provides that a jury selection plan shall "specify those groups of persons or occupational classes whose member shall, on individual request therefore be excused from jury service. . . . if the district court finds, and the plan states, that jury service by such class or group would entail undue hardship or extreme inconvenience. . . ."

■■ There is no merit to the defendant's contention. The trial court correctly held that the objection was not timely raised, since the defendants had not mentioned it until after the jury was impanelled. See Brooks v. United States, 5 Cir. 1969, 416 F.2d 1044, 1047. We also agree with his ruling that the jury selection plan was in compliance with the statute.

### V.

Gumanis next objects to the trial court's refusal to instruct the jury that Donaldson's claim was barred by the statute of limitations.[49] This contention is premised upon the fact that Donaldson was taken out of his care April 18, 1967, more than four years before the filing of the First Amended Complaint in this case, and about five years before the complaint was amended to add Gumanis as a defendant.

Since there is no statute of limitations provided under § 1983, federal courts adopt the statute of limitations of the state where the action arose,[50] and apply the "resemblance test" to decide which state statute is an appropriate one to apply.[51] In this case, the parties agree that the limitation period should be taken from one of three state statutes: the two-year statute applicable to both false imprisonment actions and to actions for medical malpractice; or the three-year statute applicable to actions upon liabilities created by statute; or the four-year statute applicable to miscellaneous actions not specifically provided for else-

---

49. The instruction in question read:
   You are instructed that the statute of limitations for the wrongs alleged in the complaint are for the period of four (4) years, and that the defendants should not be held accountable for any damages which occurred from wrongs occurring prior to the four (4) year period preceding the complaint.
   Donaldson argues that the defendants' objection to the trial judge's refusal to give this instruction is not properly before this Court, again because no objection was made to the trial judge's failure to give the instruction either at the charge conference or after the charge was read to the jury. See note 8 supra. Again, however, defendants' pretrial brief advised the court of the defendants' position, and again we hold that that sufficed to excuse the failure to object. See note 8 supra.

50. Campbell v. Haverhill, 1895, 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed. 280.

51. See, e. g., Smith v. Cremins, 9 Cir. 1962, 308 F.2d 187.

where in the Florida statute of limitations chapter.[52] Gumanis argues that it is irrelevant which of these 3 periods we apply, since even if the longest, the four-year statute, is applied, the period of limitations had elapsed by the time Gumanis was added as a defendant in this suit. Donaldson agrees that it is irrelevant which statute is chosen, since he argues the limitation did not begin to run until July 31, 1971, the date Donaldson was released from the hospital. Donaldson therefore argues that the suit was timely brought, even if the two-year limitation period applies.

We agree with Donaldson that the limitation period, be it two, three, or four years, did not begin to run until July 31; Donaldson's cause of action did not accrue until that time. When a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases. See, e. g., Fowkes v. Pennsylvania R. R. Co., 3 Cir. 1959, 264 F.2d 397. In the case of false imprisonment, the tort action this case most resembles, the cause of action does not accrue until the release of the imprisoned party.[53]

We have found no Florida decision addressing the question when a cause of action for false imprisonment accrues. But in a § 1983 suit, even though a state statute is applied, the question when a federal cause of action *accrues* is a matter of federal, not state law.[54] The state statute is applied in the first place not as a matter of legal compulsion, but merely as a matter of convenience; there is no other period of limitation available.[55] We hold that in a case such as this one, where a tort causing continuing injury is alleged, a patient's cause of action does not accrue until the date of his release.

### VI.

Gumanis next contends[56] that the district court erred in refusing to instruct the jury that he and the other defendants were entitled to a defense of quasi-judicial immunity under the Civil Rights Acts. At issue is defendant's proposed instruction number 11, which read: "If you find that the defendants were operating in a quasi-judicial function, in that they, under state law, were making a judgment as to whether or not plaintiff should be released, defendants are immune from liability under the Civil Rights Act."

Gumanis relies primarily upon three Ninth Circuit cases. The first and most important is Hoffman v. Halden, 1969, 268 F.2d 280, in which the Ninth Circuit held that the superintendent of a state mental hospital, who allegedly had wrongfully detained a patient committed under a valid judicial commitment order, was immune from liability. The superintendent was empowered to release the patient when, in his own judgment, he found the patient no longer in need of confinement. The Court held that because he had been exercising a "discretionary" function, the Superintendent was immune from liability. The other

52. Fla.Stat. § 95.11(4), (5)(a), (6), F.S.A.

53. See, e. g., Bronaugh v. Harding Hospital, Inc., 1958, 12 Ohio App.2d 110, 231 N.E.2d 487; Mobley v. Broome, 1958, 248 N.C. 54, 102 S.E.2d 407; Matovina v. Hult, 1955, 125 Ind.App. 236, 244, 123 N.E.2d 893; Belflower v. Blackshere, Okl.1955, 281 P.2d 423, 425; Oosterwyk v. Bucholtz, 1947, 250 Wis. 521, 525, 27 N.W.2d 361; Jedzierowski v. Jordan, 1961, 157 Me. 352, 172 A.2d 636.

54. See, e. g., Rawlings v. Ray, 1941, 312 U.S. 96, 61 S.Ct. 473, 85 L.Ed. 605; Cope v. Anderson, 1947, 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602; Sandidge v. Rogers, S.D.Ind.

1958, 167 F.Supp. 553, 556; 2 Moore's Federal Practice ¶ 3.07(2) at 750.

55. See McAllister v. Magnolia Petroleum Co., 1958, 357 U.S. 221, 228–230, 78 S.Ct. 1201, 2 L.Ed.2d 1272 (Brennan, J., concurring); 2 Moore's Federal Practice ¶ 3.07(2).

56. Once again, Donaldson argues that the objection to the refusal to give the instruction is not properly before the Court. See notes 8, 49 *supra*. Once again, we hold that the trial judge was sufficiently apprised of the defendants' objections for us to consider the objection as having been preserved. See notes 8, 49 *supra*.

two Ninth Circuit cases, Silver v. Dickson, 1968, 403 F.2d 642, and Keeton v. Procunier, 1971, 468 F.2d 810, held that members of state parole boards are immune from § 1983 liability, on the ground that the threat of liability would "exert a restricting influence on the overall functioning of the agency". *Silver*, 403 F.2d at 643.

Gumanis's argument is essentially that he is entitled to the defense, available to state officials in most common law jurisdictions, of absolute immunity for acts done in the performance of a "discretionary"—as opposed to a "ministerial"—function. See, *e. g.*, Barr v. Matteo, 1959, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (immunity for federal officials as a matter of federal common law). For discussions of the common law rule, see Norton v. McShane, 5 Cir. 1964, 332 F.2d 855, 857–861 (Rives, J.); Anderson v. Nosser, 5 Cir. 1971, 438 F.2d 183, 198–200 (Goldberg, J.), modified en banc on other grounds, 1972, 456 F.2d 835; Carter v. Carlson, 1971, 144 U.S.App.D.C. 388, 447 F.2d 358, 361–365; 2 F. Harper & F. James, The Law of Torts § 29.10 at 1638–46 (1956). We must reject Gumanis's argument, however, because we have consistently held that the full range of officials immunity available at common law do not apply in actions brought under § 1983. Roberts v. Williams, 5 Cir. 1972, 456 F.2d 819, 830; *Anderson, supra*, 438 F.2d at 201; *Norton, supra*, 332 F.2d at 860–861 (dictum). In taking this position we have been joined by all the other circuits that have considered the question. *Carter, supra*, 447 F.2d at 365; Dale v. Hahn, 2 Cir. 1971, 440 F.2d 633; Kletschka v. Driver, 2 Cir. 1969, 411 F.2d 436, 448; Jobson v. Henne, 2 Cir. 1966, 355 F.2d 129, 133–134; McLaughlin v. Tilendis, 7 Cir. 1968, 398 F.2d 287; Donovan v. Reinbold, 9 Cir. 1970, 433 F.2d 738.

Official immunity has been restricted under § 1983, because that provision is directed at actions "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory", and provides that "every person" subjecting another to a deprivation of constitutional rights shall be liable. See Francis v. Lyman, 1 Cir. 1954, 216 F.2d 583, 587; *Jobson, supra*, 355 F.2d at 133; *Anderson, supra*, 438 F.2d at 201; *Hoffman, supra*, 268 F.2d at 300. It has been the view of the courts that recognizing broad judicial immunities "would practically constitute a judicial repeal" of § 1983, since state officers are likely to be the primary persons found acting "under color of" law. *Hoffman, supra*, at 300; *Jobson, supra*, 355 F.2d at 134. Accordingly, the courts have repudiated what the district court for the District of Nevada has called the "discretionary act test" for determining when official immunity is appropriate in § 1983 cases. Adamian v. University of Nevada, 1973, 359 F.Supp. 825, 834. Instead, we and other courts have applied what the *Adamian* court called the "good faith for qualified governmental immunity" test, allowing immunity when (1) the officer's acts were discretionary; *and* (2) the officer was acting in good faith. Here, as noted above, the trial judge instructed the jury to find for the defendants if it found the defendants acted in good faith; and, again as noted above, the defendants have not challenged the propriety or phrasing of this instruction.[57] That instruction was all that was required by this Court's version of the doctrine of "quasi-judicial" or "official" immunity from Civil Rights Act liability.[58]

---

57. The full instruction is quoted in part III *supra*.

58. It is appropriate to say in this context that we do not view the *Hoffman, Silver* and *Keeton* cases as sound authority for a contrary result. The Ninth Circuit has made it clear that *Hoffman* and *Silver* do not "stand for the broad principle that all public officials are immune from Civil Rights Act liability if their acts were discretionary and done within the scope of their official duties". Donovan v. Reinbold, 9 Cir. 1970, 433 F.2d 738, 744. The Second Cir-

## VII.

The remainder of the objections Gumanis raises pose little difficulty. Gumanis contends that the trial judge erred in allowing the jury to award punitive damages. The objection is without merit. The trial judge instructed the jury that it could award punitive damages if it found that the defendants had acted "maliciously", "wantonly", or "oppressively". The instruction was proper as a matter of law, and there was ample evidence, some of it recited in our statement of facts above, to support a jury finding that the defendants' acts were "malicious", "wanton", or "oppressive".

Gumanis argues that Donaldson's failure to receive treatment was a result largely of his own refusal, on religious grounds, to accept certain forms of treatment, particularly medication and electroshock treatments, and his failure to petition for restoration of his competency under Fla. Statutes § 394.22, F.S.A. Neither argument has any merit. As for Donaldson's refusal of forms of treatment, the trial judge instructed the jury: "You are instructed that if Plaintiff through his own actions contributed to the withholding of a particular form of treatment, that Plaintiff is not entitled to collect compensation from the Defendants for the failure to give such treatment during the particular period or periods Plaintiff refused such treatment." Gumanis did not at the trial and does not now object to this instruction. We find no reason to believe that either the verdict or the award of damages was based upon the failure to give Donaldson those forms of treatment he refused. As for his failure to petition for a restoration of his competency, the statute in question does not permit a person adjudged incompetent to petition on his own for a restoration of his competency; the petition may be instituted only by a parent, guardian, or "next friend". Donaldson cannot be held accountable for not doing what he was legally unable to do.

Finally, Gumanis contends that "the cumulative effect of certain errors and irregularities during the course of the trial was such as to significantly undermine the fairness of the trial itself". We have considered these alleged errors too, and find no merit to any one of them. We have also concluded, upon a review of the record, that cumulatively they did not affect the fairness of the trial to any appreciable extent.

The judgment of the district court is

Affirmed.

cuit had earlier stated its view that it would have disapproved the *Hoffman* decision if that decision had to be read to mean that "all subordinate state officials should be granted an immunity for all discretionary acts". *Jobson, supra,* 355 F.2d at 134 n. 11. And we ourselves have already once stated our view that *Hoffman* represented a "questionabl[e] resol[ution]" of the problem of official immunity under the Civil Rights Act. Norton v. McShane, 5 Cir. 1964, 332 F.2d 855, 861 n. 9, (Rives, J.). To the extent that *Hoffman*, by implying that state mental health officials should enjoy some form of "quasi-judicial immunity", is read as authority for a result contrary to the one we reach here, we decline to follow it. We rely instead on *Dale* and *Jobson*, where the Second Circuit held state psychiatrists and mental hospital officials were not entitled to immunity under § 1983.