S.H. and P.F., individually and on behalf of all others similarly situated, Plaintiffs–Appellants,

v.

Joe EDWARDS and R. Derril Gay, individually and in their official capacity, Defendants–Appellees.

No. 87–8635.

United States Court of Appeals, Eleventh Circuit.

Nov. 28, 1988.

Rehearing and Rehearing En Banc Denied Jan. 9, 1989.

Phyllis J. Holmen, Georgia Legal Services Program, Jonathan A. Zimring, Atlanta, Ga., for plaintiffs-appellants.

Jefferson James Davis, Sp. Asst. Atty. Gen., State of Georgia, Vivian Davidson Egan, Atlanta, Ga., for defendants-appellees.

Before FAY and CLARK, Circuit Judges, and GONZALEZ [*], District Judges.

PER CURIAM:

The judgment of the district court and the rulings questioned on appeal are affirmed based upon and for the reasons stated in the thoughtful Order of Court entered on April 10, 1987 and appended hereto.

The dissent criticizes our approach in this matter and consequently, we add these thoughts. The plaintiffs won the lawsuit. Extensive relief was afforded. Both the United States Magistrate and the District Judge entered substantial writings explaining the various rulings. In our opinion, nothing is gained by repeating that analysis. Where we part company is on the one issue of whether the plaintiffs have a substantive due process right, under the federal constitution, to habilitation in a community setting. The district court held in the negative and we agree. Judge Clark disagrees.

All agree that *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), is the guiding light but reasonable litigants, attorneys and judges disagree on its application. The plaintiffs in this case maintain that mentally retarded patients fare better in community placements as opposed to institutional environments and that certain professionals have recommended that members of the alleged class be placed in such community facilities. The defendants agree, but suggest that not enough community facilities are available and that the institutional facilities being used do not deviate from accepted professional standards.

We agree with the Circuits [1] which interpret *Youngberg* as requiring states to provide habilitation in accord with prevailing standards of practice. The experts in this case agree that Georgia's decision to keep these plaintiffs in institutional settings until community facilities can be made available does not deviate from professionally accepted standards.

We join with Judge Clark in hoping that available funds will be used to secure more community type quarters. We disagree that plaintiffs have a constitutional right to such. The fact that the State of Georgia is trying to provide "better" facilities does not mean they are depriving plaintiffs of their constitutional rights by continuing to use institutions which the experts find are being operated in accord with sound professional standards.

AFFIRMED.

## APPENDIX

S.H. and P.F. individually and on behalf of all others similarly situated, Plaintiffs

vs.

Joe Edwards and R. Derril Gay, individually and in their official capacities, Defendants

Civil Action File No. C81–877A

In the United States District Court

for the Northern District of Georgia

Atlanta Division

ORDER OF COURT

This matter is before the court on the Report and Recommendation of the Magistrate ("Magistrate's Report"). The matter

---

[*] Honorable Jose A. Gonzalez, Jr., U.S. District Judge for the Southern District of Florida, sitting by designation.

[1] *Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239 (2nd Cir.1984); *Phillips v. Thompson*, 715 F.2d 365, 368 (7th Cir.1983).

went before the Magistrate on cross-motions of the parties for summary judgment.

### Procedural Background

Plaintiffs seek judgment upon the following issues: 1) whether defendants have violated plaintiffs' rights to due process under the Fourteenth Amendment to the Constitution of the United States by failing to provide to plaintiffs adjudicatory reviews of their indefinite commitments; 2) whether defendants have violated plaintiffs' rights to equal protection under the Fourteenth Amendment by arbitrarily providing adjudicatory reviews to some institutionalized mentally retarded adults, but not to plaintiffs; 3) whether defendants' failure to provide to plaintiffs adjudicatory reviews of plaintiffs' commitments violates state law; 4) whether defendants' failure to provide to plaintiffs community services to relieve them from their indefinite confinement violates state law; and 5) whether plaintiffs are entitled to a full and complete remedy to make them whole for the constitutional injuries they have suffered. Defendants seek summary judgment on the entire complaint.

### Magistrate's Recommendation

After a hearing on the cross-motions for summary judgment, the Magistrate issued a Report and Recommendation which contains the following recommendations:

1. Plaintiffs' state law claims be dismissed;
2. Plaintiffs' be granted summary judgment on the issue of a right to a continued Rehabilitation Review Procedure (O.C.G.A. § 37–4–42) on both equal protection and procedural due process grounds;
3. Defendants be granted summary judgment on the issue of a right to community habilitation, on substantive due process grounds;
4. Defendants be granted summary judgment on all claims under Section 504 of the Rehabilitation Act (29 U.S. C. § 794 *et seq.*).

Plaintiffs object to the third and fourth recommendations, and defendants object to the second recommendation. The court will address the second through fourth of the Magistrate's recommendations seriatim after setting forth certain material facts that will aid the disposition of these matters.

### Statement of Certain Undisputed Facts

1. Plaintiffs S.H. and P.F. were residents of Gracewood State School and Hospital, a state owned and operated institution for the mentally retarded at the time this action was filed.
2. Plaintiffs represent a class consisting of all adult persons who are mentally retarded or otherwise handicapped, who have been, are now, or will be residents of state-owned or operated facilities for the mentally retarded, who since September 1, 1978, have been, are being, or will be denied access to due process hearing procedures which would determine their need for community placement and/or continued hospitalization.
3. S.H. and P.F. had been residents of Gracewood since before September 1, 1978.
4. Plaintiffs S.H. and P.F. were admitted to Gracewood without having received a commitment hearing.
5. S.H. was twenty-four years old when this action was filed. She had been a resident of state hospitals for approximately fifteen years at the inception of this action.
6. P.F. was thirty-five when this action was filed and had been a resident of state hospitals for twenty-five years.
7. Both S.H. and P.F. reached the age of 18 prior to September 1, 1978.
8. On September 1, 1978 defendants initiated procedures to review the continued institutionalization of adult residents of its mental retardation facilities as required by amendments to the Georgia statute governing the institutionalization of retarded persons.
9. Persons who received such reviews had their need for continued institutionalization reconsidered after the first six months of their commitment and thereafter on an annual basis.

10. Persons who received such reviews, if continued commitment was deemed necessary after the initial commitment period of six months, had their cases reviewed by a panel of impartial professionals not involved in the residents' active treatment (the panels are known as Committees for Continued Habilitation Review).

11. Until April 1, 1979, following the reviews by the Committees for Continued Habilitation Review, residents received a hearing before a Department of Human Resources hearing examiner to determine their need for continued commitment.

12. At the hearing the persons receiving the reviews have a right to counsel, a right to subpoena and cross-examine witnesses, a right to present evidence including independent evaluations of the continuing need for commitment, a right to have an alternative plan to receive services in a lesser restrictive environment presented to the hearing officer by the Department of Human Resources and the right to have findings of fact made by an impartial hearing officer.

13. After April 1, 1979, as a result of statutory amendments governing the provision of such reviews, following the reviews by the Committees for Continued Habilitation Review, all persons reviewed had their service plans reviewed by a hearing officer of the Department of Human Resources. A hearing was then held if the hearing officer chose to initiate one or if the resident or a representative requested that one be held.

14. Neither S.H., nor P.F., ever had a review of their continued commitment by a Continued Habilitation Review Committee prior to the commencement of this action. As a result neither S.H. nor P.F. received the "automatic" hearing before a Department of Human Resources hearing examiner during the period prior to April 1, 1979, nor thereafter, the opportunity to have their case reviewed by a hearing examiner, the opportunity to request that a hearing examiner hold a hearing, or notice of any right to make such a request.

15. As a result, neither S.H. nor P.F., was provided the opportunity to exercise the right to appointed counsel, or the right to have an alternative plan to receive services in a lesser restrictive environment developed by the Department of Human Resources or to exercise any of the other rights ancillary to a continued habilitation review hearing.

16. As of September 1, 1981, more than 1,000 mentally retarded institutionalized adults were not being afforded a review of their continued commitment by a Continued Habilitation Review Committee, nor the opportunity for further review received by the balance of mentally retarded institutionalized adults.

17. Such reviews had been provided to the balance of mentally retarded residents of Defendants' institutions since September 1, 1978.

18. Since September 1, 1978, it has been the practice of Gracewood only to process mentally retarded adults for such reviews if the individual had been committed to the institution by court order or if the individual had been admitted as a child and had become an adult since September 1, 1978.

19. In 1980, a project, known as Project P.R.O. or Preparing for Residential Options, was undertaken for the Mental Retardation Section of the Division of Mental Health and Mental Retardation of the Georgia Department of Human Resources.

20. A final Project P.R.O. report was completed in January 1981.

21. The purpose of Project P.R.O. was to assist Defendants in assessing the comprehensive service needs of individual mentally retarded persons in need of alternative residential services, analyze the service needs of such persons in terms of type of services, cost of services, and the time frame for meeting those needs.

22. Project P.R.O. involved the assessment of 607 institutional clients identified by staff of Defendants' hospitals who would be more appropriately served in alternative residential services.

23. The data obtained by Project P.R.O. indicated that at least 30% of the institutionalized mentally retarded population in Georgia would be more appropriately served in community residential options.

24. The data obtained by Project P.R.O. indicated that 213 mentally retarded residents of Gracewood State School and Hospital would be more appropriately served in an alternative residential placement.

25. The data obtained by Project P.R.O. indicated that 122 mentally retarded residents of Central State Hospital would be more appropriately served in an alternative residential placement.

26. The data obtained by Project P.R.O. indicated that 155 mentally retarded residents of Georgia Retardation Center at Atlanta would be more appropriately served in an alternative residential placement.

27. The data obtained by Project P.R.O. indicated that 55 mentally retarded residents of Southwestern State Hospital would be more appropriately served in an alternative residential placement.

28. The data obtained by Project P.R.O. indicated that 38 mentally retarded residents of Northwestern Regional Hospital at Rome would be more appropriately served in an alternative residential placement.

29. The data obtained by Project P.R.O. indicated that 9 mentally retarded residents of Georgia Retardation Center at Athens would be more appropriately served in an alternative residential placement.

30. All institutionalized mentally retarded residents have their individualized program plans reviewed on an annual basis by an interdisciplinary team.

31. Institutionalized mentally retarded individuals who are not under a court order are not advised of a right to have decisions of the interdisciplinary team reviewed or of any hearing rights should they disagree with the decisions of their interdisciplinary team.

32. Interdisciplinary teams which perform reviews do not have authority to order that a person be discharged.

33. During their residency in Defendants' hospitals, S.H. and P.F. were recommended by hospital staff for community placement.

34. The person in charge of S.H.'s habilitation program at Gracewood was of the opinion, since 1979, that S.H. did not need to be at Gracewood, but should be placed in a community placement.

35. Defendants admit that they have not provided a placement and the necessary community services in an alternative community placement for all residents of its mental retardation facilities for whom it has been suggested or recommended that such an alternative placement might be or would be appropriate.

36. Defendants admit that they did not provide to Plaintiffs S.H. and P.F., neither community alternatives to institutionalization, nor the necessary community services during the period from September 1, 1978 to May 11, 1981.

*Right to a Continued Rehabilitation Review Procedure (O.C.G.A. § 37–4–42).*

Defendants object to the Magistrate's recommendation that this court adopt his due process analysis on the grounds that (1) the Magistrate has not considered whether a protectable interest was raised by plaintiffs before he determined what procedure is required to protect that alleged protectable interest, and (2) if plaintiffs do have a protectable interest, the treatment review procedures which the defendants provide to plaintiffs are sufficient to protect any liberty interest the plaintiffs may have.

The court is not persuaded by the defendants' objections. The Magistrate reports that the protectable interest, here, is the right to personal liberty and freedom. Magistrate's Report and Recommendation, page 14. Citing *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Magistrate reports that mentally retarded individuals retain an interest in safety, freedom of movement, and certain forms of training during confinement.

Furthermore, the Magistrate notes that the right not to be inappropriately stigmatized by hospitalization is a protectable interest under the Fourteenth Amendment due process clause, as well. *Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). This court agrees with the Magistrate's recommendation regarding the Fourteenth Amendment due process issue for the following reasons.

Defendants apply the correct Fourteenth Amendment due process test, as set forth in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972), but miss the mark in reaching the appropriate result. Citing *Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239 (2d Cir. 1984), defendants argue that there is no right to treatment of mentally retarded persons in a community residential placement, and therefore, no protectable liberty interest pursuant to the Fourteenth Amendment due process provision.

The Magistrate's recommendation on the procedural due process question is not as broad as defendants suggest, however. The Magistrate has wisely discerned that the plaintiffs in this case stand to lose the opportunity for habilitation in a less restrictive setting should the O.C.G.A. § 37-4-42 review process determine that a less restrictive setting would better serve their needs. Magistrate's Report at 15. The Magistrate continues by stating that

> [c]ontinued confinement would be 'erroneous' if the length and conditions of the confinement do not bear any relation to the purpose of the confinement. In the case of the plaintiffs, habilitation is the purpose of their confinement. Inappropriate institutionalization and treatment can result in actual regression of the individual's skills and not merely a simple failure to improve. *Georgia Ass'n of Retarded Citizens v. McDaniel*, 511 F.Supp. 1263 (N.D.Ga.1981). The record indicates that many institutionalized persons would be better served in community placements. (Citation omitted).... If formal continued Habilitation Reviews [pursuant to O.C.G.A. § 37-4-42] were available to plaintiffs, their release [or,

"transfer from institutions to community placements"] would be facilitated by placement on the waiting list for community services. (Citation omitted).

*Id.* at 15–16.

Defendants argue that plaintiffs have not alleged that they have been inappropriately institutionalized, and therefore, the court should not utilize the language of *Georgia Association of Retarded Citizens.* Defendants' argument does not persuade this court. The record indicates that although many of the members of plaintiffs' class have been recommended for discharge by hospital review teams, they remain hospitalized because they are not placed on the community placement waiting list as a result of their denial of the formal habilitation review process. Plaintiffs' Exhibits in Support of Motion for Partial Summary Judgment, No. 18, pp 1, 12. Continued institutionalization under the circumstances set forth above is not appropriate.

This court is acutely aware of the admonition, articulated in *Youngberg, supra,* that the lower federal courts "show deference to the judgment exercised by a qualified professional" when determining whether a state institution has provided a mentally retarded patient "with such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints." 102 S.Ct. at 2461. However, that Court specifically noted that "[i]t may well be unreasonable not to provide training when training could significantly reduce the need for restraints or the likelihood of violence." *Id.* Unlike the facts in *Youngberg,* the plaintiffs in this case are not so situated that no amount of training can help them. The court finds that it is unreasonable that plaintiffs have not been placed on the community placement waiting list despite recommendations of defendants' own professional staff.

When the Magistrate's observations are viewed against the backdrop of the above *Youngberg* language, it is apparent that a protectable Fourteenth Amendment liberty

interest exists in this case. Defendants have not shown good reason why members of the plaintiff class have not been afforded the hearings prescribed by O.C.G.A. § 37–4–42. For the above, and other reasons presented by the Magistrate, the court finds that defendants' failure to provide plaintiffs with the continued habilitation reviews, which could facilitate plaintiffs' access to more appropriate treatment, violates the plaintiffs' procedural due process guarantees.

Accordingly, the court agrees with the Magistrate that plaintiffs are entitled to the continued habilitation review procedure on procedural due process grounds.

Defendants also argue that they have not violated the plaintiffs' equal protection rights. Suffice it to say, the court is not persuaded by the defendants' argument that the plaintiffs are not similarly situated to other classifications of patients who receive continued habilitation reviews. The court disagrees with defendants' contention that plaintiffs retain a status of voluntary admittees merely because they were voluntarily admitted before 1978. It is established that a voluntary admittee's status changes to that of an involuntary admittee upon an institution's, or the state's, refusal to grant her discharge upon an institution's, or the state's, refusal to grant her discharge upon her request. *Doe v. Public Health Trust of Dade County*, 696 F.2d 901, 903 n. 10 (11th Cir.1983).

Thus, this court agrees with the Magistrate's finding regarding the equivalence of review procedures of the pre- and post–1978 admittees. The formal continued habilitation review procedures offer the plaintiffs much more protection than the informal review procedures currently being exercised by the various hospitals. Moreover, the court agrees with the Magistrate that the extension of the continued habilitation review procedures will not financially overburden the state, in view of the fact that the mechanism for such reviews is already in place.

1. The Section 504 claim will be addressed *infra.*

*Substantive Right to Community Residential Placements*

This court agrees with the Magistrate, via analysis which differs from that of the Magistrate, that plaintiffs have no substantive due process right to habilitation in a community setting. This position is supported by the conclusions reached in a number of cases. E.g., in *Youngberg*, the Supreme Court held that a state has no constitutional duty to provide substantive services for those within its borders; the Seventh Circuit Court of Appeals has held that where a state denied community placement to mentally retarded individuals, and instead, placed them in state institutions, no substantive due process to liberty was violated if that decision were based on professional judgment. *Phillips v. Thompson*, 715 F.2d 365, 368 (7th Cir.1983). Moreover, the Second Circuit has held that there is no "entitlement to community placement or a 'least restrictive environment' under the federal Constitution." *Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239, 1248 (2d Cir.1984). This court is persuaded by the rationale of *Cuomo*, and shall rule upon this matter accordingly.

The court notes that in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Supreme Court ruled that the plaintiffs in that action were barred by the Eleventh Amendment from obtaining relief in federal court based on allegations that the state or its officials violated state law. *Cuomo* at 1248. "Thus, any relief granted to plaintiffs in this action must be based on either[,] federal statutes[,] or the federal Constitution." *Id.* As to this issue, no federal statutes apply,[1] thereby leaving this court to determine whether the federal Constitution provides an entitlement to community placement or a least restrictive environment. *See Cuomo* at 1248.

Citing *Youngberg*, the Second Circuit stated that due process is satisfied if restraints are imposed on mentally retarded individuals in accordance with the judgment of qualified professionals, and that courts should defer to that professional

judgment. *Id.* The *Cuomo* court elaborated that the *Youngberg* professional judgment standard is not insufficiently met merely because pertinent medical experts disagree with the care or treatment decisions that were actually made. *Id.* "Rather, it is a standard that determines whether a particular decision has substantially met professionally accepted minimum standards." *Id.* If the decision is made by a professional, it is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment. *Id.*

In this case before the court, the parties have filed various affidavits which correspond to the language in *Cuomo* regarding expert medical testimony which does not agree. Specifically, the parties have stipulated that mentally retarded patients fare better in community placements as opposed to institutional environments, and that certain professionals within the Georgia system have recommended that members of the plaintiffs' class be placed in community living situations. However, premised upon affidavits of Richard Hagen, Joanne Miklas, Dr. Donald Dunagan, and Bernard Wagner, the court finds that defendants' decision to treat plaintiff in the institutional setting does not deviate from professionally accepted standards. *See id.*

In light of the above finding, this court's responsibility is met regarding the issue of answering the substantive due process question. "Even if every expert . . . agrees that another type of . . . residence setting might be better, the federal courts may only decide whether the treatment or residence setting that actually was selected was a 'substantial departure' from prevailing standards of practice." *Cuomo,* 737 F.2d at 1248–1249 (citing 457 U.S. at 323, 102 S.Ct. at 246 ("[i]t is not appropriate for the courts to specify which of several professionally accepted choices should have been made")). Therefore, this court holds that retaining residents at the various defendant institutions is not "such a substan-

tial departure from accepted professional judgment, practice[,] or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *See Cuomo,* at 1249 (citing 457 U.S. at 323, 102 S.Ct. at 2462). Thus, the minimum professional standards are satisfied. *Id.*

*Section 504*

This court is not persuaded by plaintiffs' objections to the Magistrate's Report and Recommendation regarding his finding on the Section 504 claims of plaintiffs. Nor does the court adopt the Magistrate's rationale that Section 504 does not apply to situations wherein groups with varying degrees of handicap are treated differently. However, it adopts the Magistrate's recommendation that defendants be granted summary judgment on the Section 504 issue because the facts of this case do not support the contention that plaintiffs were denied O.C.G.A. § 37–4–42 habilitation reviews "solely by reason of [their] handicap," as the statute requires. 29 U.S.C. § 794.

Apparently, the state legislature felt the need to establish a chronological bright-line as a means of triggering the habilitation review requirements, and it exercised its legislative prerogative in establishing September 1, 1978 as that bright-line.

*Conclusion*

The court

1. GRANTS defendants' motion for summary judgment on plaintiffs' state law claims;

2. GRANTS plaintiffs' motion for summary judgment on plaintiffs' right to receive O.C.G.A. § 37–4–42 continued habilitation reviews;

3. GRANTS defendants' motion for summary judgment regarding substantive due process right to least restrictive treatment;

4. GRANTS defendants' motion for summary judgment on plaintiffs' Section 504 claims.

SO ORDERED, this 10th day of April, 1987.

/s/Horace T. Ward
HORACE T. WARD
UNITED STATES DISTRICT JUDGE

CLARK, Circuit Judge, dissenting:

This case concerns the constitutional rights of the mentally retarded. It is the first case of its kind to come before this court since the Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). I am at a loss to understand the majority's failure to give a thorough appraisal of the issue presented here.

The issue is: May an agency of the State of Georgia constitutionally confine a mentally retarded person in a ward in an institution contrary to that person's professional advisor's recommendation? In this case "the person in charge of S.H.'s habilitation program at Gracewood was of the opinion, since 1979, that S.H. did not need to be at Gracewood, but should be placed in a community placement." Statement of Certain Undisputed Facts, No. 33, District Court Opinion at 7. The Supreme Court in *Youngberg* stated: "[T]he decision, if made by a professional, is presumptively valid." 457 U.S. at 323, 102 S.Ct. at 2462 (defining "professional" in n. 30). Instead of conducting a hearing, the district court granted summary judgment on the basis of these affidavits: "[T]he care provided to the mentally retarded persons at Gracewood State School and Hospital falls within the range of acceptable professional judgment...." Record, Vol. III, Tab 53 at Exhibit E. "[T]he care, training, treatment and habilitation received by residents at the Georgia Retardation Center in Atlanta falls within the range or acceptable professional judgment...." *See id.* at Exhibit D.

Thus, the district court accepted a broad generalized affidavit in support of the treatment of all retarded persons housed at Gracewood instead of the specific affidavit pertaining to plaintiff S.H. In doing so the district court ignored the applicable Georgia law:

> Each client in a facility and each person receiving services for mental retardation shall receive habilitation that is suited to his needs and is the least restrictive appropriate habilitation.

Ga.Code Ann. § 37–4–122(a) (1982).

Because the district court misapplied *Youngberg*, disregarded the law of Georgia and our circuit, and erred in granting the defendant summary judgment on this important issue, I must dissent.

## I. Plaintiffs' Due Process Claim.

The plaintiff class in this case is composed of mentally retarded persons who reside in institutions operated by the State of Georgia.[1] When this action was filed in 1981, the named plaintiffs were residents of the Gracewood State School, a state-owned facility. Like the named plaintiffs, the remaining members of the class reside in five similar institutions, which provide around the clock residential services to mentally retarded persons under the control and supervision of the Georgia Division of Mental Health, Retardation, and Substance Abuse.

Georgia statutes that govern the confinement and care for the mentally retarded were substantially amended in 1978. As a result of these changes, the State was required to provide certain judicial process safeguards for each mentally retarded person it undertook to institutionalize *after* September 1, 1978. Each person after institutionalization was entitled to a periodic review of his or her ongoing need for institutionalization and its appropriateness. *See generally* Ga.Code Ann. § 37–4–42.

---

1. The district court's opinion contains what it refers to as a "Statement of Certain Undisputed Facts." For the purposes of assessing those claims on which the defendants were granted summary judgment our duty is clear. We must read the record in the light most favorable to the plaintiffs, accept their allegations as true, and give them the benefit of the doubt where their assertions conflict with those of the defendant. C. Wright, A. Miller & M. Kane, 10 *Federal Practice and Procedure* § 2716 at 643–46 (1983 & Supp.1987) (citing *Bishop v. Wood*, 426 U.S. 341, 347, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976); *Trust Company Bank v. MGM/UA Entertainment Co.*, 772 F.2d 740, 743–44 (11th Cir.1985); *Anderson v. Winter*, 631 F.2d 1238, 1240 (5th Cir.1980)) (other citations omitted).

Yet the defendants did not make these procedures available to members of the plaintiff class, who were all committed to institutions prior to September 1, 1978. As of September 1, 1981, there were more than 1,000 mentally retarded residents of institutions who had not been provided with any reviews and thus the opportunity for further administrative or judicial review. These facts constituted the basis of the plaintiff class's equal protection claim (Count I) and the procedural aspect of their due process claim (Count II). As is clear from the district court's opinion, the plaintiffs prevailed on these issues. The district court concluded that the plaintiff class was to be placed on equal footing with post-1978 institution admittees for the purposes of habilitation reviews.

On this issue the plaintiffs were successful and the defendants have not appealed the district court's rulings with regard to the procedural process claim. The issues related to this claim are not before this court. It should be therefore noted that although the majority is publishing the district court's opinion as its own, the section discussing this claim constitutes no more than dicta. *See generally* 1B *Moore's Federal Practice* ¶ 0.402[2] (1984).

## II. The Substantive Due Process Claim.

### A. The facts.

In 1972, the Georgia legislature made the following statutory declaration in the "Community Service for the Mentally Retarded Act":

> Since the State of Georgia accepts a responsibility for its mentally retarded citizens and an obligation to them which it must discharge, facilities, programs, and services shall be made available to meet the needs of each mentally retarded person during his entire lifetime. The primary purpose of this chapter shall be to provide community-based alternatives to total institutional care so that mentally retarded individuals can continue to live in their home communities.

Ga.Code Ann. § 37–5–2. As for the implementation of this policy, the Act provides this "[t]imetable":

> The [Georgia] [D]epartment [of Human Resources] shall employ sufficient professional and nonprofessional persons to assure full implementation of this chapter by June 30, 1978. All community services specified in [Ga.Code Ann. § ] 37–5–3 shall be made for all mentally retarded individuals by June 30, 1978.

Ga.Code Ann. § 37–5–10. The "community services" referred to in the timetable are

> all community-based services deemed reasonably necessary by the department to provide for education, training, rehabilitation, and care of mentally retarded individuals [including] but not limited to: ... community residential services such as group family-care homes....

Ga.Code Ann. § 37–5–3(1).

In 1980, the appellees, through a project known as Project P.R.O. (Preparing for Residential Option), assessed the service needs of individual mentally retarded persons in the defendants' institutions. Project P.R.O. identified 607 persons who were in immediate need of alternative living placements and would be more appropriately placed in the State's residential living arrangements. Yet, as of the June 1982, 525 of the 607 persons identified as in need of community placements remained institutionalized.

This failure to so place those identified by Project P.R.O. does not appear to have been due to a lack of funding. Between fiscal year 1977 and fiscal year 1982, the appellees allowed $1,113,156 in funds appropriated for community residential services to lapse, be transferred to other programs, or go otherwise unspent. During the same time period, the appellees likewise handled $263,022 in funding appropriated for moderate training residences or group homes. The total amount of funding appropriated for community programs for the mentally retarded that the appellees permitted to lapse or go unspent reached nearly $5,000,000 during this time period.

The district court's statement of undisputed facts sets forth the central fact: treatment professionals responsible for members of the plaintiff class have recom-

mended that they be removed from the institutions in which they currently reside and placed in community living arrangements. The State has not so placed them. District Court Op. at 7.[2]

On the basis of this central fact, the plaintiffs raised the one claim that is relevant here: they maintained that because their confinement conditions in institutions are not suitable for their individual needs, such confinement violates Georgia law and the Due Process Clause of the Fourteenth Amendment. This claim was premised on 42 U.S.C. § 1983.[3] The court held that although the plaintiffs have an equal right to habilitation reviews, there is no constitutional impediment to keeping them in institutions indefinitely, even if they can demonstrate that confinement in such institutions is detrimental to their individual needs. Thus, if the State Agency officials choose, as they have, to limit the availability of community services, habilitation reviews serve no purpose.

**2.** Subsequent to the filing of this lawsuit, it appears that the defendants have placed some members of the class, including the named plaintiffs, in community-based living arrangements. This does not mean, and the defendants have not argued, that the claims of the remaining class members (still institutionalized) are moot. *See Franks v. Bowman Transportation Co., Inc.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

**3.** They also argued that they were denied, on the basis of their handicaps, rights and privileges which the State affords other persons, and that this disparate treatment constituted a violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794. This claim was supported by the fact that mentally retarded persons outside of the plaintiff class were receiving precisely those state procedural reviews and services sought by the plaintiffs. The only distinction between this class of persons and the plaintiff class was the date on which they came under the State's care. The essence of the plaintiffs' section 504 claim was that it afforded them a right to seek statutory habilitation reviews (under Ga.Code Ann. § 37–4–42) and to receive services in accordance with the judgment of their treatment professionals. As the defendants concede, the district court failed to address the substantive aspect of the plaintiffs' section 504 claim. It is clear, however, that the district court's ruling would have applied with equal force since it held that the defendants had not discriminated against the plaintiffs on the basis of their handicap.

**B.  The law.**

The district court's opinion suggests that the constitutional rights of the mentally disabled to treatment or habilitation[4] are exceedingly narrow once they are involuntarily committed by the State. I would first like to describe the current status of these rights as delineated by the Supreme Court and this court.

**1.  *The Supreme Court.***

As the Second Circuit has noted, the Supreme Court has never directly addressed the question whether the mentally disabled have a constitutional right to training or habilitation. *Woe v. Cuomo,* 729 F.2d 96, 105 (2d Cir.), *cert. denied,* 469 U.S. 936, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984). In *Youngberg,* however, the Court held that mentally retarded persons confined by the State do have a constitutionally protected liberty interest under the Fourteenth

Given the unsettled nature of this statutorily created right of action, more extensive analysis would have been helpful. I agree that allegations of arbitrary discrimination among identical classes of handicapped individuals do not support a section 504 claim. "Solely by reason of handicap," means that the mere possession of a handicap is an impermissible ground on which to decide whether an individual is to receive some benefit. *Cf. Southeastern Community College v. Davis,* 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979). Case law and section 504's implementing regulations do, however, support a section 504 claim where a recipient of federal funds discriminates against persons on the basis of the severity of a handicap—including the level of an individual's retardation. *See Plummer v. Branstad,* 731 F.2d 574, 578 (8th Cir.1984) (assuming severity of a handicap is itself a handicap); *Garrity v. Gallen,* 522 F.Supp. 171, 214–15 (D.N.H.1981); 45 C.F.R. § 84.4(b)(1)(iv).

**4.** As Judge Becker has noted, "[t]echnically, one refers to 'training' or 'habilitation' of the mentally retarded, and 'treatment' of the mentally ill." *Clark v. Cohen,* 794 F.2d 79, 92 n. 6 (3d Cir.) (Becker, J., concurring), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986). This is because mental retardation is not an illness. *See* S. Brakel, J. Parry & B. Weiner, *The Mentally Disabled and the Law* 332 (1985); *Youngberg v. Romeo,* 457 U.S. at 309 n. 1, 102 S.Ct. at 2454 n. 1.

Amendment's Due Process Clause to reasonably safe conditions, freedom from unreasonable restraint, and such minimally adequate training as may be required by these interests.

The Court's point of departure was the "established principle[ ]" that "a State is under no constitutional duty to provide substantive services for those within its border." 457 U.S. at 317, 102 S.Ct. at 2459. Yet when the State elects to place the mentally retarded in institutions, thereby making them totally dependent, there is no question that the State has a "duty to provide certain services and care." In dispensing such care and services, the State retains considerable discretion in determining the "nature and scope of its responsibilities." *Id.*

Romeo was a severely retarded individual. His attorneys conceded that no amount of training would make it possible for him to be released from the institution where he resided. Thus, they did not argue that mentally retarded persons have some "general constitutional right to training *per se,* even when no type or amount of training would lead to freedom." *Id.* at 318, 102 S.Ct. at 2459. Because of Romeo's limitations, the Court concluded that the constitutionally protected liberty interests involved in his case were those of "reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Id.* at 324, 102 S.Ct. at 2462.

In determining whether Romeo's substantive rights protected by the Due Process Clause had been violated, the Court noted the need to weigh his liberty interests against the State's reasons for restraining him. Because of the difficulties that inhere in resolving the appropriateness of a given form of treatment, a federal court must "show deference to the judgment exercised by a qualified professional." *Id.* at 322, 102 S.Ct. at 2461. Where " 'professional judgment in fact [is] exercised,' " " '[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.' " *Id.* at 321, 102 S.Ct. at 2461. (citation omitted). In determining whether a State has met its obligation to provide the level of training necessary in light of an individual retarded person's liberty interests, "decisions made by the appropriate professional[5] are entitled to a presumption of correctness." *Id.* at 324, 102 S.Ct. at 2462.

Although it did articulate a standard for assessing the State's interests in the manner of a retarded person's confinement, the *Youngberg* Court did not develop any similar test for deciding the precise level of training to which such person is constitutionally entitled. Recognizing that "the facts in cases of confinement of mentally retarded patients vary widely," the Court suggested that it was impossible to "define or identify the type of training that may be required in every case." The Court did, however, provide this guidance:

[one] properly may start with the generalization that there is a right to minimally adequate training. The basic requirement of adequacy, in terms more familiar to courts, may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case. A federal court, of course, must identify a constitutional predicate for the imposition of any affirmative duty on a State.

*Id.* at 320 n. 25, 102 S.Ct. at 2460 n. 25. Thus, in determining the precise scope of an individual retarded person's rights, "it is essential to focus on the facts and circumstances of the case before a court." *Id.*

The Court's emphasis on the facts of a retarded person's condition and the nature of his confinement makes clear that the duties of the State will vary in accordance with the severity or the lack thereof of an individual patient's retardation and with

---

5. A " 'professional' decisionmaker" is one who is competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded.
457 U.S. at 323 n. 30, 102 S.Ct. at 2462 n. 30.

the State's asserted purpose in his confinement. Once the State undertakes the duty to provide training to the mentally retarded, if a patient's training is not suited to his individual case, it cannot be said that the "conditions of [his] confinement ... comport fully with the purpose of [his] commitment," as is required by the Due Process Clause. *Id.* at 324, 102 S.Ct. at 2462 (citing *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972)).[6]

It must follow that in the case of an individual who is less severely retarded than was Romeo, that individual would retain more extensive liberty interests that are subject to the protection of the due process clause.[7]

Although the precise parameters of a mentally retarded person's constitutional right to training was not delineated by the *Youngberg,* Court, three Justices indicated their willingness to recognize the existence of such a right in a case where the issue is squarely presented. Joined by Justices Brennan and O'Connor, Justice Blackmun[8] first agreed with the majority that the question of a general right of civilly committed mentally retarded persons to training was not before the Court. Yet he indicated that an involuntarily committed individual has due process rights to such training or habilitation as is needed to *preserve* those basic self-care skills he possesses when he is first committed—"for example, the ability to dress himself and care for

his personal hygiene." 457 U.S. at 327, 102 S.Ct. at 2464.

Justice Blackmun concluded that "it would be consistent with the [majority's] reasoning ... to include within the 'minimally adequate training required by the Constitution,' such training as is reasonably necessary to prevent a person's preexisting self-care skills from *deteriorating* because of his commitment." *Id.* Based on the majority's reasoning that a civilly committed person is entitled to such training as is necessary to prevent further losses of liberty, he explained that a person capable of showing that his civil commitment resulted in a loss of self-care skills would allege "a loss of liberty quite distinct from—and as serious as—the loss of safety and freedom from unreasonable restraints." *Id.* As Justice Blackmun explained, "For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know." *Id.*

Justice Blackmun's views are in accord with those of Judge Becker, who has reminded us that "[l]iberty is more than merely the absence of physical confinement." *Clark v. Cohen,* 794 F.2d 79, 96 (3d Cir.) (Becker, J., concurring), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed. 2d 404 (1986); *see also Bolling v. Sharpe,*

6. In *Jackson,* the Supreme Court held that an incompetent pretrial detainee cannot be detained indefinitely, once a competency hearing has been held, unless the State institutes civil commitment proceedings. The *Youngberg* Court recognized that *Jackson* was distinguishable in that it was a procedural due process case. Nonetheless, its reference to the essential principle of *Jackson*—that the nature, duration and conditions of a civilly committed person's confinement must be reasonably related to the purposes of his commitment—confirms that when the purpose of commitment is habilitation, the conditions of confinement must be reasonably geared to the treatment needs of the individual retarded person.

7. In this respect, I must disagree with a statement made by the Seventh Circuit which suggests that, under *Youngberg,* the mentally retarded are *never* entitled to more than "minimally adequate training as is reasonable in light

of their interest in freedom of movement." *Phillips v. Thompson,* 715 F.2d 365, 368 (7th Cir.1983). This statement was particularly unfortunate in the context of *Phillips* because the plaintiff class was composed of "higher functioning" mentally retarded adults. The suggestion that the needs and liberty interests of this class of persons is identical to those of a severely retarded person like Romeo has no support in *Youngberg* and is antithetical to the law of this circuit, as is made clear below.

8. Only former Chief Justice Burger would have held "flatly that [Romeo] ha[d] no constitutional right to training, or 'habilitation,' *per se.*" 457 U.S. at 329, 102 S.Ct. at 2465 (Burger, C.J., concurring in the judgment). *See also O'Connor v. Donaldson,* 422 U.S. 563, 587–88, 95 S.Ct. 2486, 2500, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring) (there is no basis for equating the right not to be confined without due process and constitutional right to treatment).

347 U.S. 497, 499–500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) (liberty is not limited to mere freedom from bodily restraint but extends to all conduct which an individual is free to pursue); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) (right to liberty is right to enjoy those privileges long recognized as essential to the orderly pursuit of happiness).

### 2. *The Eleventh Circuit.*

Although *Youngberg* does not precisely establish the parameters of the rights of the mentally retarded to training, this court has indicated that the mentally ill do possess parallel rights to treatment once they are confined by the State for the purposes of treatment—and that these rights are protected by the Constitution. Since *Youngberg,* this court has not undertaken to review the continuing viability of these landmark decisions. A careful review of these decisions reveals that they are consistent with *Youngberg;* they may properly be viewed as representing a logical extension thereof.

In *Donaldson v. O'Connor,* 493 F.2d 507 (5th Cir.1974), *judgment vacated,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), this court considered "for the first time the far-reaching question whether the Fourteenth Amendment guarantees a right to treatment to persons involuntarily civilly committed to state mental hospitals." *Id.* at 509. Although the Supreme Court vacated our judgment in *Donaldson* because this court had not considered the qualified immunity defense, the Court indicated that our opinion was deprived of any precedential force. *See* 422 U.S. at 577 n. 12, 95 S.Ct. 2494 n. 12. I discuss it here because it contains a more complete explanation of the source of the right to treatment than does *Wyatt v. Aderholt*—discussed just below—which contains the identical holding. *Wyatt* is unquestionably good law in this circuit, as well as the new Fifth Circuit. *See Doe v. Public Health Trust of Dade County,* 696 F.2d 901, 903 (11th Cir. 1983) (per curiam); *Savidge v. Fincannon,* 836 F.2d 898, 908 & n. 51 (5th Cir.1988). Furthermore, as Judge Wisdom has noted, *Wyatt* was cited with approval in Justice

Blackmun's concurring opinion in *Youngberg. See Savidge,* 836 F.2d at 908 n. 51 (citing *Youngberg,* 457 U.S. at 325 n. 1, 102 S.Ct. at 2463 n. 1 (Blackmun, J., concurring)).

In *Donaldson* we held that "a person involuntarily civilly committed to a state mental hospital has a constitutional right to receive such individual treatment as will give him a reasonable opportunity to be cured or to improve his mental condition." *Id.* at 520. In reaching this conclusion, we began with the uncontroversial proposition that "civil commitment entails a 'massive curtailment of liberty' in the constitutional sense." *Id.* (citation omitted); *see also Doe v. Public Health Trust of Dade County,* 696 F.2d at 902. Beyond this, "the conclusion that the due process clause guarantees a right to treatment rest[s] upon a two-part theory." The first part acknowledges that a government abridgement of freedom must be justified in terms of "some 'permissible governmental goal.'" *Donaldson,* 493 F.2d at 520. (citation omitted). This principle requires a court to ask "precisely what government interests justify the massive abridgement of liberty [involved]." As the court noted, state civil commitment statutes are typically concerned with (1) the dangerousness of an individual, (2) the need to treat or care for an individual, (3) or the need to supervise or act as custodian of an individual. *Id.*

We described the second (and the third) of these purposes as a "*'parens patriae'* rationale" for confinement and explained that when the need for treatment serves as the State's avowed purpose for involuntary commitment, "the due process clause requires that minimally adequate treatment be in fact provided." *Id.* at 521. As then District Judge Johnson explained elsewhere, "To deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process." *Wyatt v. Stickney,* 325 F.Supp. 781, 785 (M.D.Ala.1971), *quoted in Donaldson,* 493 F.2d at 521. We thought this much implicit in the Supreme Court's

decision in *Jackson.* "If the 'purpose' of commitment is treatment, and treatment is not provided, then the 'nature' of the commitment bears no 'reasonable relation' to its 'purpose', and the constitutional rule of *Jackson* is violated." *Donaldson,* 493 F.2d at 521; *see also Lynch v. Baxley,* 744 F.2d 1452, 1460 (11th Cir.1984) (citing *Jackson* ) (jailing of persons awaiting civil commitment hearings violates substantive and procedural due process rights).

The second theoretical underpinning of the right to treatment derives from the due process limitations on the State's power to use its civil and criminal processes to detain individuals for substantial periods of time. When these limitations upon power are absent, we held that "there must be a *quid pro quo* extended by the government to justify confinement." Adequate and effective treatment constitutes such a *quid pro quo* "because absent treatment, the hospital is transformed 'into a penitentiary where one could be held indefinitely for no convicted offense.'" *Wyatt v. Stickney,* 325 F.Supp. at 784 (citation omitted), *quoted in Donaldson,* 493 F.2d at 522 n. 22. Of course, where rehabilitative treatment appears to be impossible, the appropriate *quid pro quo* is "minimally adequate habilitation and care." 493 F.2d at 522.

In *Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir.1974), we addressed the issue whether the federal courts have the power to order officials of state institutions housing the mentally ill to provide certain minimal levels of psychiatric care and treatment. Relying on the *quid pro quo* theory described in *Donaldson,* we again held that those who are civilly committed for the purposes of treatment have a constitutional right to treatment. *Id.* at 1313–14.

Our statement in *Donaldson* that the civilly committed are entitled to "such individual treatment as will give [them] a reasonable opportunity to be cured or to improve [their] condition" requires a reappraisal in light of *Youngberg.* As *Youngberg* suggests, in the case of a severely

retarded individual such as Romeo, who may have no realistic hope of improvement, talk of a "cure" is misplaced.[9] Yet in cases where improvement is possible, it cannot be said that *Youngberg* forecloses the existence of a right to such training that will produce that improvement. In a post-*Youngberg* case, Judge Becker has articulated the circumstances in which a civilly committed retarded person has the right to such treatment as will "improve his condition."

Judge Becker's paradigmatic patient is one whose skills might have improved had he or she never been committed. Building on what he refers to as Justice Blackmun's "non-deterioration principle," Judge Becker concludes that:

> the State should be required to provide such a person with at least such training as would match the improvement that she or he would have experienced if never committed. The reasoning behind this position is analogous to the reasoning supporting the non-deterioration principle: by committing people and preventing them from developing self-care skills, the state is effectively depriving them of the opportunity to develop and exercise their autonomy. This is a deprivation of their due process right to liberty. ... [Thus,] involuntarily civilly committed persons have a right to treatment sufficient to develop their self-care skills to at least the level at which they would be if the persons had not been institutionalized.

*Clark,* 794 F.2d at 96 (Becker, J., concurring).

### III. This Case Requires Reversal.

In this case, the district court held that the only question to be resolved with regard to the substantive due process issue was whether the plaintiffs' conditions of confinement were consistent with "minimum standards" of professional judgment. Because three affidavits filed by the de-

---

9. We implicitly recognized as much in *Donaldson* and *Wyatt* for we held that "where rehabilitation is impossible," the civilly committed are entitled to "minimally adequate habilitation and care, beyond the subsistence level custodial care that would be provided in a penitentiary." *Donaldson,* 493 F.2d at 522, *quoted in Wyatt,* 503 F.2d at 1314.

fendants indicated generally that institutionalization of the mentally retarded is professionally acceptable, the court concluded that the defendants had not abridged the due process rights of the plaintiffs. The court's conclusion rests on a doubly erroneous reading of *Youngberg*. First, the court failed to consider the existence of any liberty interest that might entitle the plaintiffs to treatment that is more beneficial than that which they receive as residents of institutions. Second, the court so magnified and misapplied *Youngberg*'s professional judgment standard as to write the remainder of that opinion, as well as prior law of this circuit, out of existence.

As explained above, *Youngberg* suggests that the first question for the court in a case such as this is the identification of a "constitutional predicate for the imposition of [the] affirmative duty that the plaintiff class seeks to impose" on the State. Stated differently, the court must identify the liberty interests at stake that are alleged to be unconstitutionally abridged. This analysis must necessarily take into account the specific facts concerning these plaintiffs. The plaintiffs have urged the court to recognize three distinct liberty interests: the right not to be unduly confined when there is no purpose advanced by such confinement; the right to free from the long-term effects of institutionalization, such as skill deterioration; and the right to exercise certain associational freedoms consistent with the plaintiffs' capacities.

The linchpin of the major decisions in this field—*Youngberg, Donaldson,* and *Wyatt* —is that there must be a rational relationship between the nature and duration of confinement and its purpose. *See Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). Here, the undeniable purpose of the plaintiffs' confinement is care and habilitation.[10] Under our case law, the defendants are under a duty to provide such care and habilitation once it undertakes to confine the mentally disabled for this purpose. The plaintiffs have argued vigorously that confinement in institutions constitutes an undue restraint on their liberty because, as is suggested by the recommendations of their treatment professionals, their institutionalization is unnecessary and their habilitation needs would be more properly served in a residential setting.

The district court did not assess the validity of this asserted liberty interest. Relying on *Phillips v. Thompson,* 715 F.2d 365 (7th Cir.1983) and *Society for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239 (2d Cir.1984), it concluded only that there is no substantive right to placement in the State's "community-based alternatives" to institutionalization.[11]

To hold that the plaintiffs have no substantive right to community placement is to

10. The declaration of policy preceding Georgia's statutes regarding care for the mentally retarded, recognizes the capacity of mentally retarded persons to be both "personally and socially productive." The obligations the State assumes on behalf of all mentally retarded persons are designed to help them "achieve a greater measure of independent and fulfillment and more fully enjoy their rights of citizenship." Ga.Code Ann. § 37–4–1.

11. I have already explained my disagreement with the approach taken by the Seventh Circuit in *Phillips. See* note 4. A distinct, although related, criticism may be made of *Society for Good Will.* In the latter case, the Second Circuit suggested that the concept of State-imposed "restraints on liberty" is a limited one. *See* 737 F.2d at 1247. One commentator has reproached the Second Circuit on this ground, explaining that its narrow view of what constitutes "restraint" of the mentally retarded is not sup-

ported by the Supreme Court's opinion in *Youngberg:*

In *Youngberg,* Romeo complained of being physically restrained or "shackled." When the Supreme Court discussed "undue restraint," however, it did not limit its language only to physical restraint. First the Court discussed training that would be sufficient to allow Romeo to function free from bodily restraints. The Court ... went on to explain that Romeo enjoyed "constitutionally protected interests in conditions of reasonable care and safety, reasonably *nonrestrictive confinement conditions,* and such training as may be required by these interests." This analysis clearly contemplates a liberty interest in freedom from more than mere physical restraints. Note, *The Right to Treatment: Society for Good Will to Retarded Children, Inc. v. Cuomo,* 80 Nw.L.Rev. 1355, 1377–78 (1986) (footnotes omitted) (emphasis added by commentator).

misstate the question before the court. The question here is whether, given (1) the needs of the individual plaintiffs, (2) the nature of the confinement which they face in institutions, and (3) the State's asserted reasons for so confining them, their liberty interest is being unconstitutionally abridged. Whether the plaintiffs were entitled to something "better" than permanent confinement in institutions depends entirely on the answer to these questions. Whether the State was required to place the plaintiffs into its community-based alternatives as the only viable alternative to institutionalization was a question the court could not answer without considering the facts relative to the members of the class. Such consideration was aborted by the grant of summary judgment. Had the district court permitted the plaintiffs to proceed, and had the plaintiffs demonstrated that institutionalization is inconsistent with their individual habilitation needs, the district court would have had facts before it that would have required the district court to hold that Georgia is obligated to alter the conditions of the plaintiffs' confinement. Whether this would require placement in the State's community-based alternatives depends on facts that needed to be developed at a trial.

The second liberty interest asserted by the plaintiffs is the interest in being free from the effects of prolonged institutionalization—most importantly skill deterioration. Nowhere did the district court consider the validity of this claim, a claim clearly made out in the plaintiffs' amended complaint. After reading the record in this case, I am persuaded that a material question of fact remains as to whether members of the plaintiff class are suffering skill deterioration as a result of their continued institutionalization. If such facts established skill deterioration to the satisfaction of the fact finder, the district court might well have held in accordance with the views of Justice Blackmun, that the plaintiffs have suffered a loss of liberty distinct from that inherent in their confinement. Instead, the district court viewed the case too simplistically and cut off plaintiffs' claims prematurely.

If the plaintiffs have the "skill" or capacity to live in a community setting, and actually living in such a setting—as opposed to residing permanently in an institution—is the only means through which the plaintiffs can exercise this capacity, the continued confinement in an institution constitutes a distinct loss of the liberty inherent in the free exercise of this capacity. The recommendations of certain of the plaintiffs' treatment teams indicate that they do have this capacity. Were such facts developed at trial, I would be prepared to hold that the state is under an affirmative duty to place the plaintiffs in the community. As Judge Rubin has written,

> The constitutional right to [training] is a right to a program of [training] that affords the individual a reasonable chance to acquire and maintain those life skills that enable him to cope as effectively as his own capacities permit with the demands of his own person and his environment and to raise the level of his physical, mental and social efficiency.

*Gary W. v. State of Louisiana,* 437 F.Supp. 1209, 1219 (E.D.La.1976). It is possible, however, that the habilitation needs of the plaintiff class are—or could be—met in the institutions where they reside. Again, this determination depends on facts—facts which were precluded by a summary judgment.

The third liberty interest asserted to be abridged by the defendants is that which resides in being able to associate with family and friends, rooted in the fundamental tenets of the First Amendment. I have concluded that there is no support in the record for a claim that the plaintiffs' associational freedoms are being abridged by their continued institutionalization. In addition, I note that Ga.Code Ann. § 37–4–102 grants to "clients" in State institutions the "right to communicate freely and privately with persons outside the facility and to receive visitors inside the facility."

Yet in light of the first two liberty interests described above, it is clear that the district court erred in granting summary judgment before even attempting to consid-

er whether the plaintiffs possess liberty interests beyond those of the most profoundly retarded individual. As it stands, this case instructs state authorities in this circuit that they need only meet the most basic needs of the most profoundly retarded persons when caring for the mentally retarded as a whole, regardless of the particularized needs of individual retarded persons.

As I have explained, one of the most important principles to be distilled from *Youngberg* and our earlier decisions is that the treatment to which a civilly committed person is entitled must be properly related to that person's condition. *See, e.g., Donaldson*, 493 F.2d at 520 (treatment must be individualized); *Youngberg*, 457 U.S. at 322–23, 102 S.Ct. at 2461–62 (professional judgment standard not satisfied unless judgment actually exercised). For Judge Rubin, this is the quintessential element of the inquiry: "What the constitution requires as the state's due to the individual it confines is a program that is *proper for that individual.*" *Gary W.*, 437 F.Supp. at 1219 (emphasis added). After *Youngberg*, it is clear that a State must demonstrate fully the presence of a counterbalancing due process interest by showing that the level of treatment provided to the involuntarily confined is consistent with individualized professional judgment.

It is undisputed that members of the plaintiff class have not been receiving the treatment recommended by those professionals responsible for their care. Yet the district court apparently thought that the State could satisfy the burden of showing that no constitutionally protected interests are being abridged by merely filing three affidavits which express general approval of the institutionalization of the mentally retarded. None of these affidavits is longer than three pages. None refers expressly to any member of the class. None indicates that the affiant is familiar with the case histories of the members of the class.

Instead, each contains a broad statement indicating generally that institutionalization of the mentally retarded is not outside the bounds of generally accepted professional judgment.[12] It is simply absurd to suggest that the professional judgment standard contemplated by the Supreme Court in *Youngberg* can be satisfied in this manner. *See Thomas S. v. Morrow*, 601 F.Supp. 1055, 1058 (W.D.N.C.1984) (court "must look for guidance to the professional judgment and decision of *those who examined* [plaintiff]"), *aff'd as modified*, 781 F.2d 367 (4th Cir.), *cert. denied sub nom. Kirk v. Thomas S.*, 476 U.S. 1124, 106 S.Ct. 1992, 90 L.Ed.2d 673 (1986) (emphasis added).

The district court's professional judgment analysis derived from *Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239 (2d Cir.1984), which held that the mentally retarded have no constitutional right to placement in the community. The *Society for Good Will* court held that the professional judgment standard requires only that a decision as to a patient's treatment be consistent with "professionally accepted minimum standards." *Id.* at 1248. Citing *Society for Good Will*, the district court held that the defendants' affidavits were sufficient to discharge the their burden of proving that the level of care being provided to every member of the class was constitutionally adequate. Apparently, the fact that these affidavits "correspond to the language in [*Society for Good Will*]" was sufficient for the district court.

In affirming these rulings, the majority has disregarded *Youngberg*. The majority has instructed defendants situated similarly to the defendants in this case that they need only find a few experts willing to aver summarily that institutionalization provides a professionally acceptable treatment environment for the mentally retarded to overcome any allegations that such environ-

---

12. *See* Record, Vol. III, Tab 53 at Exhibit C ("[The] treatment provided the 575 mentally retarded residents in the Developmental Disability Section at Central State Hospital is within the range of accepted professional judgment of ...

professionals who provide treatment, training, care and habilitation to the mentally retarded both within the State of Georgia and the entire United States."); *id.* at Exhibit D.

ment is constitutionally inadequate to meet the needs of individual retarded citizens.

Our court has a distinguished tradition of sensitivity to the liberty interests of the mentally disabled and the obligations that the State must meet once it takes such persons into custody. This case will be properly read as a significant departure from that tradition since the majority has not even undertaken to consider whether mentally retarded persons may *ever* have any constitutionally protected liberty interests that go beyond those inherent in the most basic needs. Our case law has recognized, and I would again hold, that the mentally retarded who are capable of appreciating more than the most rudimentary liberty are entitled to expect that the State shall not confine them in a manner inconsistent with their individual needs.